JoNes, Chief Judge,
delivered the opinion of the court:
The issues in this case grow out of a concession contract made with the Fish and Wildlife Service of the United States Department of the Interior, hereinafter referred to as the “Service.” The contract was signed on October 5, 1956, but was to cover operations from September 1, 1955, for a 10-year period.
The contract was for the construction and operation of a motel and restaurant facilities to serve the public on the Swan Lake National Wildlife Eefuge, hereinafter referred to as the “Eefuge,” in Missouri. It is one of the largest wild goose refuges in the country. The land was owned by the United States, but the State of Missouri (as did other States) retained certain controls, including the right to issue waterfowl regulations, not in conflict with Federal statutes enacted and regulations issued pursuant thereto under the terms of the Migratory Bird Treaty of 1916. It was a cooperative program between the state and Federal governments.
Plaintiffs allege that defendant (1) breached the contract by curtailing the hunting season and issuing unreasonable *287 regulations governing the use of the hunting area by the public, thus reducing anticipated profits and producing financial loss to the plaintiffs, (2) construed the terms and conditions of the contract arbitrarily and unreasonably as to default, termination, and compensation, thus depriving plaintiffs of their rights under the provisions of the contract, and (3) further breached the contract by permitting another party to sell food and refreshments in a trailer on the premises of the Swan Lake Refuge area.
Defendant denies the above allegations and asserts that plaintiff J. S. McGuire was an experienced hunter fully aware before construction of the facility and before the execution of the contract that rules and regulations governing the hunting were to be issued by the Service, and other regulations were issued by the Missouri Conservation Commission pursuant to the laws of the State of Missouri; that the primary purpose of the Refuge was the conservation of migratory waterfowl; that it did not misconstrue or misapply the terms of the contract; that plaintiffs’ troubles arose largely from the fact that they were unable to finance their operation; that it cooperated in all reasonable ways in an effort to find a concessionaire to take over the unfinished contract for plaintiffs, and that plaintiffs insisted upon an unreasonable price for the facilities which they constructed.
Thus, the litigants are in practically total disagreement both in the meaning of the disputed terms of the contract and as to the causes of plaintiffs’ difficulties and losses.
In the extensive hearings on the case nearly 2,000 pages of oral testimony were taken and more than 100 documents and letters of vai'ious types were filed as exhibits.
The trial commissioner has made very clear and detailed findings of fact which analyze the evidence, documents, and issues presented by the parties. Due to the necessary length of the findings of fact and the volume of testimony, we will only repeat the facts necessary to a proper discussion of the issues.
The Swan Lake Wildlife Refuge, one of the largest in the nation, is located in Chariton County, Missouri, on property owned by the defendant. Geese in vast numbers come to this Refuge and to nearby waters. The Secretary of the Interior, on recommendation of the Service, issued waterfowl regula *288 tions pursuant to tbe Migratory Bird Treaty of 1916, 39 Stat. 1702, and statutes enacted under the terms of that treaty. Individual states, including Missouri, also issue waterfowl regulations subject to the requirement that they not be in conflict with Federal regulations and statutes or the treaty. States are authorized to adopt such regulations. States cannot extend the open season on birds beyond that provided by the Federal Government but may provide stricter regulations. Federal statutes and the migratory bird regulations permit this to be done. Pertinent portions of the statutes and regulations are set out in findings 3 to 6, inclusive. These include a cooperative agreement executed March 11, 1955, between the Fish and Wildlife Service, United States Department of the Interior, and the Missouri Conservation Commission for the administration of public waterfowl hunting on certain lands of the Swan Lake National Wildlife Refuge of Missouri. The Missouri statutes provide for enforcement of the law by State officials, authorize arrests by agents of the State Conservation Commission and the promulgation of rules and regulations by the State Commission for the protection of wildlife, including migratory birds.
Pertinent parts of the cooperative agreement are set cut-in finding 4. It was stipulated in the agreement that “No information or news release affecting basic policy or of a controversial nature shall be issued by either the State or the Service without prior agreement between the State and the Service.”
On August 12, 1955, the Service issued a public notice entitled “Proposals for Recreational Use Facilities at Swan Lake National Wildlife Refuge, near Sumner, Missouri.” In this notice it. advised that the primary purpose of the Refuge was for the management, protection, and conservation of migratory waterfowl. In the Service’s notice was this language:
In cooperation with the Missouri Conservation Department and to the extent consistent and compatible with that objective a portion of the refuge is included in a State administered public shooting area. It is desired to make a small area on the refuge adjacent to the public shooting area available to provide facilities for hunter accommodations. It is the purpose of this notice, there *289 fore, to inform tbe public of the establishment of a location for recreational use facilities and to invite proposals for the establishment of a concession at such location.
The notice further provided for a concession and invited persons having experience “and financial means to meet the minimum conditions specified in this notice and who desire to enter into negotiations” to address a letter to that effect to the Regional Director. The notice emphasized that the concessionaire should have “[financial responsibility, financial resources, with references, adequate for development and operation of the concession in accordance with the minimum requirements.”
By letter of August 17, 1955, the plaintiffs advised the Service that they wished to be considered for an exclusive concession to serve the public on the Swan Lake National Wildlife Refuge. The plaintiffs stated in the letter that the name of the proposed operating concession would be Goose Hill, Inc., a Missouri corporation to be formed, and that the officers and controlling stockholders would be the plaintiffs. Plaintiffs represented that they had a joint investment which by certified audit as of May 31, 1955, showed $108,000 in Fairfax Plastic Molders, Inc., a Kansas corporation, and, in addition, plaintiffs had saleable machinery in the amount of $50,000. They proposed to erect for the 1955 season 4 units of a 20-unit motel and to add for the 1956 season additional facilities for kitchen, food storage and numerous other facilities adequate for meetings of up to 200 people. Additional representations contained in plaintiffs’ letter are set out in finding 7.
On August 19,1955, the plaintiffs received a telegram from the Service to the effect that the Service would be pleased to negotiate a contract for a concession at the Refuge, and that a draft of a proposed contract would be mailed. On September 1, 1955, the acting assistant regional director wrote the plaintiffs enclosing the form of proposed contract and suggested that the plaintiffs might in the meantime proceed with the construction of facilities “on the basis of data you submitted in response to our Public Notice.” Pertinent provisions of the contract are set out in finding 10. The contract was not signed until October 5, 1956. The contract was signed by plaintiffs as individuals and not in a corporate *290 capacity as they had proposed. In the meantime plaintiffs were in partial operation during the season of 1955.
Plaintiffs operated the facilities during the season of 1956. Plaintiffs complained that the hunting season for geese was reduced from 70 to 55 days during the 1955 season and that for the 1956 season individual hunters were not permitted to operate on successive days. However, these regulations were issued by the State Commission which Commission, under the statutes of Missouri, had authority to shorten the season and make other restrictions. Hunters generally were fully aware of this power of regulation as a part of the conservation program.
As a matter of fact, when the entire record is considered we are unable to escape the conclusion that plaintiffs’ difficulties arose largely from the fact that they were unable properly to finance their operations. They were unable to dispose of their frozen assets. They were compelled to incur liabilities for the construction program to the extent that it was installed. Several mechanics’ and materialmen’s liens involving many thousands of dollars were filed. It may be noted in this connection that paragraph 15 (c) of the contract provided that the concessionaire should hold the Federal Government, their officers, agents, or employees harmless from liability on account of any claims whatever for wages, supplies, equipment, damage, or injury to persons or property arising out of any activity conducted under the terms of the contract.
Plaintiffs evidently were overoptimistic about what they would be able to do. The plaintiffs testified that they had expected to sell some other property in order to finance the operation but were unable to do so. They did not even have funds to install a telephone for making reservations in the facilities which they had constructed, but used the nearby State office when that office was open.
It also appears from the record that plaintiffs established prices which were rather high for the average hunter. The rooms ranged from $10 for single occupancy to $24 for quadruple occupancy. The food was extra. These prices seemed high for the average hunter, for the type of service which was available. Plaintiffs increased rates for food and lodging for the 1956 season after an unsuccessful 1955 season. *291 Tbe shortened hunting season also contributed to plaintiffs’ troubles, but plaintiffs are charged with knowledge that their State under its own laws could shorten the season. Plaintiffs were warned by the Service that there might be a short season in some years. The limits on hunting on successive days were also within the legal rights of the State. All of this did not reduce the number of hunters as the statistics of record show. The flocks of geese were not dispersed as alleged, although due to hunting and weather conditions the number of geese in 1956 was somewhat smaller than expected. However, the number of hunters was larger in 1956 than in 1955.
In the early part of 1957 the plaintiffs notified the Service that they would not be able to continue operating the concession, and asked that paragraphs 9, 10, and 11 of the contract be put into operation. There is no doubt that defendant did agree to help plaintiffs find a successor concessionaire, and, in fact, did most of the looking and work in that connection. We do not construe the terms of the contract that the defendant agreed to pay plaintiffs for their interest if the search was unsuccessful. Plaintiffs claim the defendant did so agree and that anyway the contract compelled such payment.[1] *292 Following numerous conferences and correspondence, the plaintiffs insisted that the contract had been cancelled and that defendant was obligated to pay the full value of the improvements. Paragraph 10 provides that if the concessionaire shall cease to be authorized to conduct operations and thereafter such operations are to be conducted by a successor, the Service, as a condition to the granting of a permit or contract to operate, will require such successor to purchase the concessionaire’s interest and to pay the concessionaire the fair market value thereof, such value to be deemed the sound value of such improvements at the time of the transfer without regard to the terms of the contract.
Paragraph 10(b) stipulates that if the Service shall determine that during the term of this contract or upon its termination for any reason it is desirable to discontinue the operations authorized thereunder, or any of them, or abandon, remove, or abolish any of the concessionaire’s improvements, the Service, before making such termination effective, shall take action to assure the concessionaire of compensation for its interest in such improvements in an amount not less than their book value. The plaintiffs insist that this provision of the contract, which is set out in finding 11, obligates the defendant to pay the full value of all of the facilities when the contract is ended.
Thus, the plaintiffs insist that the defendant is liable to plaintiffs for their expenditures on the property. It will be noted, however, that this would only come to pass in the event the defendant decides that it is not desirable to continue operations. This was never determined. The plaintiffs make the serious charge that the defendant is trying to drag out a settlement for 10 years because by then the property would be fully depreciated and, under the contract, since the defendant would have to pay book value, it could pick up the property for nothing.
There is no evidence in the record to justify such a charge. What delayed action was the dispute between the parties as to the interpretation of the contract. It does not seem reasonable to think that in this great area the defendant would want to deprive the public of the privileges that are granted under the Migratory Bird Treaty and attendant *293 statutes and regulations. As a matter of fact, there was in that particular area a greater flight of geese in 1958 than for many previous years. It is natural to assume that in the interest of the public, as well as in the promotion of the conservation program, hunting under reasonable regulations should be permitted to continue in this vast area. The record indicates that had plaintiffs been able to finance the operations as their letter indicated that they would be able to do and had they been willing to make reasonable charges so that the average hunter could afford to use the facilities, the results might have been different.
Plaintiffs’ troubles stem also from using bad business judgment, refusing to mitigate their damages by permitting the Fish and Wildlife Service to let someone operate their concession temporarily which might have aided in finding a successor concessionaire, refusing to take less than book value for their property, and their insistence that defendant agreed to insure them against failure. This refusal to consider any less than book value and their unwillingness to permit temporary operation naturally greatly interfered with securing a successor concessionaire.
Plaintiffs also claim that there was in fact a successor concessionaire in that a trailer stand was permitted to sell food and shotgun shells when plaintiffs refused to reopen. But this was long after plaintiffs had insisted that they were financially unable to operate and could not and would not continue to operate the facilities for the year 1957. As a matter of common sense, with the great number of hunters who wanted to come there some effort should have been made to accommodate them. In spite of plaintiffs’ complaint, there were more hunters in 1956 than there had been in 1955. There were still many people who wanted to hunt in this great facility and there is no reason why a continued program should not be had. The trailer did not use any of the plaintiffs’ facilities. It cannot be considered, therefore, to be a successor concessionaire. It was more in the nature of a hot dog stand. Its operators did, in fact, offer to buy out plaintiffs but at a figure plaintiffs were unwilling to consider.
It is an unfortunate circumstance, but the plaintiffs were unable properly to finance their operations, and they were *294 unwilling to make any adjustment on what they regarded as the value of their property. They insisted upon their interpretation of paragraph 10(b) of the contract. It may be repeated in this connection, however, that the defendant has at no time made any determination that it is desirable to discontinue the concession. Plaintiffs undertook to make that determination. Obviously, it would be much to the public convenience to have the concession in operation. A determination by the Service to discontinue is a prerequisite to payment under the provisions of paragraph 10(b).
This is a rather strange situation. Plaintiffs will not and cannot operate their concession, and defendant cannot. The buyer cannot be found who will satisfy plaintiffs. The facts indicate that plaintiffs will be compelled to take a loss either by taking less than book value from some buyer or ask for arbitration as to the value under paragraph 10(a) of the contract as a means of endeavoring to secure a concessionaire who is willing to take over the property. This court has no power to compel the Service to discontinue the concession. There is, thus, a stalemate. In the state of the record we have no choice but to dismiss the case.
Plaintiffs’ petition will be dismissed.
The defendant’s counterclaim will also be dismissed.
It is so ordered.
Davis, Judge; Durfee, Judge; Laramore, Judge; and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs are husband and wife, residents of the State of Kansas and citizens of the United States of America. They bring this suit for alleged breach of contract by defendant acting through the Fish and Wildlife Service of the Department of the Interior, hereafter usually referred to as the Service. The plaintiffs had a contract with defendant, as more fully described hereafter, for operation of a facility plaintiffs constructed at the Swan Lake Wildlife Refuge *295 in Chariton County, Missouri, on property owned by defendant.
2. The Secretary of the Interior, on recommendation of the Service, promulgates waterfowl regulations pursuant to the Migratory Bird Treaty of 1916 and statutes enacted pursuant thereto. Individual states, including Missouri, also issue waterfowl regulations which are not in conflict with Federal regulations and statutes or the treaty. States are authorized to adopt such regulations under state law. States cannot extend the open season on birds beyond that provided by the Federal Government but may provide stricter regulations. This is provided by Federal statute and the migratory bird regulations.
3. Section 12.050, Vernon’s Annotated Statutes of Missouri, in effect at the time of the contract in suit, is entitled “United States May Acquire Areas of Land or Water Necessary for Migratory-Bird Beservations.” It reads in pertinent part:
* * * consent of the State of Missouri is given to the acquisition by the United States by purchase, * * * of such areas of land or water, or of land and water in Missouri as the United States may deem necessary for the establishment of migratory-bird reservations * * * reserving, however, to the State of Missouri, full and complete jurisdiction and authority over all such areas not incompatible with the administration, maintenance, protection and control thereof by the United States under the terms of said Act of Congress; provided such acquisition and the operation of any such areas shall be subject to the approval of the State Conservation Commission.
Title XYI, chapter 252, section 252.030, entitled “Wild Life of Missouri — ownership and title,” provides:
The ownership of and title to all wild life of and within the state, whether resident, migratory or im-gorted, dead or alive, are hereby declared to be in the tate of Missouri. Any person who fails to comply with or who violates this law or any such rules and regulations shall not acquire or enforce any title, ownership or possessory right in any such wild life; and any person who pursues, takes, kills, possesses or disposes of any such wild life or attempts to do so, shall be deemed to consent that the title of said wild life shall be and remain *296 in the State of Missouri for the purpose of control, management, restoration, conservation and regulation thereof.
Section 252.040, entitled “Taking of Wild Life — rules and regulations,” provides:
No wild life shall be pursued, taken, killed, possessed or disposed of except in the manner, to the extent and at the time or times permitted by such rules and regulations ; and any pursuit, taking, killing, possession or disposition thereof, except as permitted by such rules and regulations, are hereby prohibited. Any person violating this section shall be guilty of a misdemeanor.
Other sections of the Missouri statutes provide for enforcement of the law by state officials, authorize arrests by agents of the State Conservation Commission and the promulgation of rules and regulations by this Commission for the protection of wildlife, including migratory birds.
4. A cooperative agreement, effective March 11, 1955, was made between the Fish and Wildlife Service, United States Department of the Interior, and the Missouri Conservation Commission for the Administration of Public Waterfowl Hunting on certain lands of the Swan Lake National Wildlife Refuge, Missouri. The agreement provided, inter alia, that whereas the Missouri Conservation Commission, referred to in the agreement as the State, was desirous of cooperating in the management and administration of public hunting on the lands declared by the Service to be available for the hunting of migratory waterfowl, it was agreed as follows:
1. Upon determination by the Director of the Fish and Wildlife Service, public hunting will be allowed. Managed hunting will be conducted on such lands of the refuge as may be designated from time to time by the Director of the Service. * * *.
_ 2. The State will provide the signs, supplies, materials, and personnel as may be required for constructing the blinds and other hunting facilities, * * *.
3. Pit sites shall be located and staked by the Swan Lake Refuge Manager and a designated representative of the State.
4. The State shall issue permits to hunt, shall regulate the number of hunters, and shall be responsible for the allotment of blinds. All blinds shall be operated *297 on a preconceived and approved plan for tbe duration of tbe waterfowl season. An. impartial method will be used to determine the allocation of blinds to hunters and all available blinds, as designated for use under the at lual management plans, will be utilized insofar as the number of hunters permit. In order to defray expenses connected with the operation and administration of the public hunting area, the State may charge, collect, and retain a fee as mutually agreed upon for materials furnished and services rendered.
5. A public hunting; plan shall be prepared annually by the State and submitted to the Service prior to July 1 of each year. In the event no changes of the approved plan are contemplated, a letter so stating from the State to the Service shall be considered adequate. No hunting plans shall be placed into effect unless approved by both the Service and the State.
6. The parties hereto jointly shall be responsible for the enforcement of regulations made pursuant to the Migratory Bird Conservation Act, as amended, and to an order promulgated by the Director of the Fish and Wildlife Service permitting public hunting on the Swan Lake National Wildlife Refuge, and shall otherwise assist and cooperate in all activities relating to the enforcement of State and Federal laws and regulations applicable to the conduct of public hunting on the refuge. * * *
7. When, in the opinion of the parties hereto, further public hunting would be inimical to the best interests of Canada goose management, hunting privileges shall be suspended on the area and, the State by its regulation shall close to the hunting of Canada geese the county of Chariton, and such 'additional areas as may be necessary.
$ $ $ * $
9. No information or news release affecting basic policy or of a controversial nature shall be issued by either the State or the Service without prior agreement between the State and the Service. The Swan Lake Refuge Manager shall be immediately advised of any change affecting the administration of the public hunting area by the State.
5. By orders of the acting director of the Service, Department of the Interior, dated September 8, 1955, and September 14,1956, permitting hunting on the Swan Lake National Wildlife Refuge, it was provided, inter alia, as follows:
*298 * * * I have determined that the bunting of geese may be permitted on certain lands of the Swan Lake National Wildlife Eefuge, Missouri, during the 1955 waterfowl hunting season, subject to the following conditions, restrictions, and requirements:
# ifi * # #
2. /State laws. Any person who hunts on the refuge must comply with the applicable laws and regulations of the State of Missouri, and, if required by such laws and regulations, such persons shall possess a valid hunting license issued by the State and such special permit as may be required by the State for hunting within the refuge.
ít»
6. State cooperation. State cooperation may be enlisted in the regulation, management, and operation of the public hunting area, and the State may promulgate such special regulations as may be necessary for such regulation, management, and operation. In the event that such State regulations are issued, compliance therewith shall be a requisite to lawful entry for the purpose of hunting.
6. On August 12, 1955, the Service issued a public notice, entitled “Proposals for Eecreational Use Facilities at Swan Lake National Wildlife Eefuge, near Sumner, Missouri.” The notice stated as follows:
1. Objeotive. The Swan Lake National Wildlife Eefuge, near Sumner, Missouri, * * * has been established primarily for the management, protection, and conservation of migratory waterfowl. In cooperation with the Missouri Conservation Department and to the extent consistent and compatible with that objective a portion of the refuge is included in a State administered public shooting area. It is desired to make a small area on the refuge adjacent to the public shooting area available to provide facilities for hunter accommodations. It is the purpose of this notice, therefore, to inform the public of the establishment of a location for recreational use facilities and to invite proposals for the establishment of a concession at such location.
After describing the location of the proposed facility, and the necessary facilities and services to be rendered, the notice stated:
*299 4. CONCESSION OPERATING conditions. The concession shall be operated in a manner to attract and facilitate public use and enj oyment of the area. All Federal, State and local laws and regulations governing use of refuge areas, and the health and safety of the public shall apply. Prices charged by the concessionaire shall be regulated consistent with local prevailing rates and a reasonable return on the concessionaire’s investment.
Paragraph 5 of the public notice stated that the proposed concession contract would provide for the following:
5(b) Continuous prosecution of construction of the minimum required facilities and completion thereof during the initial 3-year period * * *. Concession shall have at least 16 units of the motel building ready for use by October 15,1955. Kemainder of minimum facilb ties, within the 3-year period.
Paragraph 7 of the public notice invited persons, having the experience “and financial means to meet the minimum conditions specified in this notice and who desire to enter into negotiations leading to a contract for operation of the area,” to address a letter to that effect to the regional director, the letter to contain, as a minimum, information on the following:
7 (c) Financial responsibility, financial resources, with references, adequate for development and operation of the concession in accordance with the minimum requirements.
The public notice contained a date within which written proposals would be entertained by the acting regional director, to wit, August 19, 1955.
7. Plaintiffs responded to the public notice by letter dated August 17, 1955, to the regional director of the Service at Minneapolis. The letter stated that plaintiffs wished to be considered “for an exclusive concession” to serve the public on the Swan Lake National Wildlife Eefuge. The letter stated further, in part, that the name of the proposed operating concession would be Goose Hill, Inc., a Missouri corporation to be formed, and that the officers and controlling stockholders would be plaintiffs. Plaintiffs represented that they had a joint investment which by certified audit as of May 31, 1955, showed $108,000 in Fairfax Plastic Molders, Inc., a Kansas corporation, and in addition, had saleable *300 machinery valued at $50,000. Plaintiffs proposed to erect for the 1955 season 4 units of a 20-unit motel, which would be utilized for a dining room, kitchen, office and administrative-living quarters. By the 1956 season it was proposed to add a large dining room and a lean-to which would provide kitchen and food storage space, public toilets, store and chef’s quarters. The dining room would seat 128 people and, in addition, there would be a “coffee bar” for 30 people. The dining room, it was suggested, would be adequate for meetings of up to 200 people. Other buildings were also contemplated. Plaintiffs’ letter stated that inasmuch as “extensive hunting activity is carried on at the adjacent Fountain Grove Area, and on private property surrounding Swan Lake Befuge, facilities for cleaning ducks and geese will be installed. This will require a building of at least 12' x 28'. * * * A utility building to house ice machines, pumps, and other essential services * * * will also be required.” Plaintiffs proposed to provide a surfaced parking area, walks, driveways, wells, sewer lines and septic tanks to furnish and equip the facility and to provide a food inventory for an investment of approximately $75,000.
8. Plaintiffs’ letter of August 17, 1955, discussed the rates to be charged patrons, which were $10 for single occupancy, $15 for double occupancy, $18 for triple and $20 for quadruple occupancy. The letter also discussed proposed charges for food and the problem of operating personnel, stating:
Charges for food are tentatively based on National Restaurant Association procedure based on three times the base cost of the food itself. It is proposed that the food and service be equivalent to that offered by first class hotels in the larger midwest cities. Since the capacity of this facility will by no means accommodate all of the people hunting in this immediate area, such rates and services are proposed in order to: 1. Avoid competition with existing facilities in the adjacent towns of Mendon and Sumner. 2. Provide the type of service some patrons desire, which is not available in said towns. By so doing, we take no business away from existing private facilities, but instead, supplement those facilities by offering a class of service not presently available.
*301 The operation, when complete, will require approximately 15 people in full operation. Permanent personnel shall consist of manager, stenographer-bookkeeper, and custodian on a year around basis. It is proposed that the operation be conducted under the supervision of the concessionaire, and one or the other principal owners to be in residence at least 44ths of the operating season
It was plaintiffs’ intention to cater to a clientele that could afford to pay first-class rates for food and lodging. Plaintiffs’ motel rates for the 1956 hunting season were from $20 to $24 per room occupied by four guests. There were subsequent complaints that plaintiffs’ rates for food and lodging were excessive for the average hunter attracted to Swan Lake because he could not afford to patronize private hunting clubs or lands.
9. On August 19, 1955, plaintiff J. S. McGuire received a telegram from the Service reading as follows: “Service will be pleased to negotiate contract for concession at Swan Lake Kefuge. Draft of proposed contract will be mailed to you shortly.” On September 1, 1955, the acting assistant regional director wrote plaintiff J. S. McGuire enclosing the form of the contract which the Service proposed to use to cover the concession facilities at Swan Lake Eefuge and suggesting that if after reviewing it McGuire found it satisfactory to execute the same and return all copies to the Service for acceptance by the Service. The letter described the lands upon which the motel and restaurant were to be erected, as containing approximately 3 acres on a tract 300' x 500'. The Service solicited from McGuire his master plan or development outline for the area together with a performance bond in the amount of $5,000. The letter stated: “You may, in the meantime, proceed with construction of the facilities on the basis of the data you submitted in response to our Public Notice.”
10. In January 1956 plaintiffs advised the Service that they had abandoned the idea of the corporation. On October 5, 1956, the plaintiffs, doing business as Goose Hill Lodge, entered into a contract with the Service. The contract was for a period of 10 years from September 1, 1955; plaintiffs, therein called the concessioner (concessionaire), *302 entered into construction of tbe facility prior to October 5, 1956, as authorized by defendant’s letter of September 1,1955. The contract, paragraph 1, however, provided as to the term thereof, the following:
1. Term of CONTRACT. * * * In the event the Con-cessioner is prevented from any construction or from conducting the operations authorized hereunder because of circumstances beyond its control, it may, on written application and the approval thereof by the Director of the Service, be relieved from any or all of the obligations hereunder for such stated periods as the Director may deem warranted in the circumstances, and the ap-of the provision or provisions of this contract involved shall be suspended during such period or periods.
11. Paragraph 2 of the contract assigned to the concessionaire, for the term and purpose of the contract, such pieces and parcels of land administered by the Service as were described in the contract for the erection of buildings and other structures or improvements needed to exercise the privilege granted by the contract subject to the conditions described. There was a condition that the concessionaire agreed to construct the facilities described — a motel, dining room or lodge and utilities and utility buildings 'and parking area. The concessionaire was authorized to sell meals, foodstuffs, lodging, gasoline, oil and hunting supplies. Paragraph 2(d) provided in part:
_ * * * Title to all structures erected by the Conces-sioner on the premises hereby granted shall vest in the Concessioner subject to the provisions of paragraph 10 hereof.
Paragraphs2(f) and2(g) provided:
(f) The use of the premises for which permission is here given shall always be subject to dominant use by the Fish and Wildlife Service, United States Department of the Interior, in its control over game, fur animals, wild birds, and fishes, and the Concessioner shall not do or suffer to be done by any of his agents any act that may interfere with the control by said Service over such wildlife, and the Concessioner specifically waives any and all claims for damage for interference with its use that may be occasioned by the Service, or *303 its representatives and employees, in carrying out such activities.
(g) Authorized sites when abandoned by the Con-cessioner shall be immediately restored as nearly as possible to a natural condition, and any building or other structure destroyed by fire or otherwise shall be promptly rebuilt, repaired, or otherwise restored by the Con-cessioner according to plans and specifications approved by the authorized representative of the Service, or at the option of the Service, the site shall be immediately cleared and restored, as nearly as possible, to a natural condition by the Concessioner in a manner satisfactory to the Service without cost to the Federal Government.
Paragraph 3 of the contract provided that the concessionaire establish and operate every service authorized in a manner satisfactory to the Service. Sale of all commodities was specifically required to be made in accordance with all applicable state and local laws. There was agreement that the facilities be developed within 3 years from the effective date of the contract.
Paragraph 4 of the contract dealt with utilities. Paragraph 5 required the concessionaire to pay a $100 annual franchise fee. For the period September 1, 1955 through August 31, 1960, the concessionaire agreed to pay to the Service 3 percent of the gross returns on a quarterly basis, and 6 percent thereafter. Paragraph 6 required approval of all rates and charges for services and sales by the Service. Paragraph 7 of the contract required the concessionaire to maintain accounting records in a form to be approved by the Service and available to the Service for inspection.
Paragraphs 8,9, arid 10 of the contract provided:
8. VaoatioN on premises. Upon the termination of this contract, the Concessioner shall vacate the premises and return them .to the Director, together with any and all Government-owned structures, facilities, and equipment used by it in the same condition in which they were received, ordinary wear and tear and damage by the elements excepted. The Concessioner, if all rental charges and/or damage claims due the Government have been paid, and subject to the provision of Section 10 of this contract, may be permitted, within a reasonable period, but not to exceed six (6) months, to remove all structures and/or equipment, etc., placed or used on the *304 premises 'by it, except in case the material was furnished by the Government. Upon failure to remove said structures, equipment, etc., within the aforesaid period or any extension thereof granted by the Director of the Service, they shall become the property of the United States.
9. TERMINATION oe contract. In case of any substantial default or continued unsatisfactory performance by the Concessioner under this contract, the Director of the Service may terminate this contract by the following procedure:
(a) The Director shall give to the Concessioner written notice specifying the particulars of the alleged default or unsatisfactory performance.
(b) Not less than thirty (30) days after receipt by the Concessioner of such notice, the Director shall grant to the Concessioner an opportunity to be heard upon the charges.
(c) Following such opportunity to be heard, the Director shall have the power to determine whether there has been such a default or unsatisfactory performance.
(d) If the Director shall decide that there has been such a default or unsatisfactory performance, he shall give to the Concessioner written notice of such decision specifying the particulars thereof.
(e) If the Concessioner fails or refuses to remedy such default or unsatisfactory performance within such reasonable period of time as may be fixed by the Director, then the Director may declare this contract terminated upon such date or upon such contingency as he may deem proper to protect the public interest, provided that such termination of this contract shall not terminate or impair the Concessioner’s ownership in improvements.
10. Compensation eor concessioner’s interest, (a) If, for any reason, the Concessioner shall cease to be authorized to conduct the operations authorized hereunder, or any of them, and thereafter such operations are to be conducted by a successor, whether a private person or an agency of the Government, (1) the Con-cessioner will sell and transfer to the successor designated by the Service its interest in Concessioner’s improvements and all other property of the Concessioner used or held for use in connection with such operations; and (2) the Service will require such successor, as a condition to the granting of a permit or contract to operate, to purchase from the Concessioner such interest and other property, and to pay the Conces-sioner the fair value thereof. Such fair value shall be deemed to be the sound value of such improvements *305 at the time of transfer of such interest, without regard to the term of the contract. Merchandise and supplies shall be valued at replacement cost, including transportation. Equipment shall be valued at replacement cost, less depreciation and obsolescence. If the Concessioner and the proposed purchaser cannot agree upon the fair value of any item or items, the fair value thereof shall be determined by the majority vote of a board of three appraisers, selected as follows: * * *
(b) If the Service shall determine that, during the term of this contract or upon its termination for any reason, it is desirable to discontinue the operations authorized hereunder, or any of them, and/or to abandon, remove, or demolish any of the Concessioner’s improvements, then the Service, will, before making such determination effective, take such action as may be necessary to assure the Concessioner of compensation (1) for its interest in such improvements in an amount not less than their book value, provided that if such an improvement is to be replaced by the Concessioner then such compensation shall be not less than the sound value thereof determined as provided in subsection (a) of this section; (2) for the cost of restoring the land to a natural condition; (3) for the cost of transporting to a reasonable market for sale such movable property of the Concessioner as may be made useless by such determination; and (4) for the actual cost to the Con-cessioner of such removal or demolition, less salvage, resulting therefrom.
(c) To avoid interruption of service to the public upon the termination of this contract for any reason, the Concessioner, upon the request of the Service, will (1) continue to conduct the operations authorized hereunder for a reasonable time to allow the Service to select a successor, or (2) consent to the use by a temporary operator designated by the Service of the Concessioner’s improvements upon fair terms and conditions.
Paragraph 11 dealt with the mortgage and assignments. It said, in part: “In the event of default on such a mortgage or such other indebtedness, or of other assignments, transfer, or encumbrance, the creditor or any assignee thereof, shall succeed to the possessory interest of the Concessioner in con-cessioner’s improvements, but shall not thereby acquire operating rights or privileges.”
*306 Paragraph 12 of the contract referred to cooperation in emergencies and paragraph 13 to insurance.
Paragraphs 14 and 15 provided in part:
14. MiscellANeous conditions. The Concessioner shall also observe the following provisions:
(a) It will not use the premises assigned, or any of the rights or privileges herein granted except and to such extent only as may be needed and intended to be used in good faith by it in carrying out the true intent and meaning of this contract. It will faithfully keep, observe, enforce, and obey, and require its employees and all persons under its control to keep, observe, enforce, and obey each and every provision in this contract and all applicable acts, or any rules, orders, or regulations of the Fish and Wildlife Service, and of the State and local government.
% i}i # #
15. Miscellaneous trovtsions
(a) In all cases where rights or privileges are granted herein in general or indefinite terms, the extent of the use of such rights or privileges by the Concessioner shall be determined by the Director of the Service, and the mention of specific restrictions, conditions, and stipulations herein shall not be construed as in any way impairing the general powers of supervision, regulation, and control of the Service, which are hereby reserved over all the activities of the Concessioner.
❖ Hi * Hi #
(c) The Concessioner shall hold and save the said Service and the Federal Government, their officers, agents, or employees, harmless from liability on account of any claims whatsoever for wages, supplies, equipment, damage, or injury to persons or property arising out of any activity conducted or undertaken under the terms of this contract or by reason of the exercise of any privilege hereunder.
12. Plaintiff J. S. McGuire was an experienced hunter familiar with the Swan Lake area. In July or August 1955 he approached Francis C. Gillett, regional refuge supervisor at Minneapolis, and suggested that because of his experience in the Swan Lake area he believed that a concession there would be desirable. Gillett was interested but noncommittal and suggested that with the season opening on October 27, 1955, the time was short to comply with the necessary public *307 advertising and to complete arrangements so that a facility conld be built for the 1955 season. It was also pointed out to McGuire that liquor could not be sold in the wildlife area and that he might be better off to lease a concession from a private owner. Mr. McGuire knew that the State Conservation Commission of Missouri had a headquarters on 12% acres of land owned by defendant at Swan Lake. He knew that there would be only about a 55-day “shooting period” per season but thought that his investment could be amortized with a minimum of 600 days in a 12-year period but would require a volume business of $1,800 per day “to pay out.” He realized that there was “a pretty high risk, considering the season.” He rejected the idea suggested by Gillett that a place on the highway would get longer use. He said, “I don’t think there is any chance of getting it in operation this year, but we do want to lay the groundwork.” He knew that the number of birds in the 1955 season would be only a guess. The hunting season of 1955 was the. first for geese on the Swan Lake Wildlife Eefuge. Previous protection of birds at that site had increased the flock attracted to it.
13. J. S. McGuire not only was personally acquainted with officials hi the Service but knew the director of the Missouri Conservation Commission, the Missouri supervisor of game and many other officials, including those employed at the headquarters of the Commission at Swan Lake. That headquarters was about 200 yards from plaintiffs’ proposed motel. He was acquainted with and used the facilities of that headquarters and understood that it had control of the issuing of permits in the name of the Commission to those desiring to hunt on the refuge. J. S. McGuire testified, however, that no representative of defendant indicated to him that the State of Missouri was a party to this contract with the Service or had anything to say between the Service and plaintiffs as concessionaires.
14. Francis C. Gillett, supervisor of refuges at the time here in issue, was familiar with plaintiffs’ letter of August 17, 1955, in which plaintiffs sought the concession in response to defendant’s public notice. Plaintiffs were the only bidders to respond. It was Gillett’s responsibility to determine *308 if plaintiffs were qualified for the concession and to make a recommendation to the regional director of the Service. Gil-lett accepted the information furnished by plaintiffs in their letter of August 17, 1955, “at face value” and upon this document and upon the oral representations of J. S. McGuire as to plaintiffs’ financial capacity and on other factors and without further inquiry he favorably recommended plaintiffs for the concession. The recommendation was accepted, the aforementioned contract was awarded and plaintiffs proceeded with construction.
15. Plaintiffs did not complete construction of the concession facilities until October 1956. However, they completed the construction to an extent sufficient to furnish breakfast, lunch and hunting supplies to hunters by November 12, 1955, and lodging for some hunters after November 20, 1955. About 10 units of the 20-unit motel were finished at that time. In March, April, September and October 1956, however, mechanics’ liens were filed against the concession for labor and materials furnished in construction of the motel and restaurant. This came to the defendant’s attention promptly. J. S. McGuire, however, indicated to the Service that there were problems in connection with the construction and materials and that his proposed disposal of interest in the Fairfax Plastic Molding Corporation would enable plaintiffs to resolve financial difficulties. Plaintiffs were not able to sell this interest and thus raise money to satisfy the liens. They were even unable to have a telephone installed in their motel to accept reservations and were forced to rely on the telephone of the headquarters of the State Conservation Commission at Swan Lake when those headquarters were open. Plaintiffs did order a telephone but defaulted on their agreement to pay for it.
16. Representatives of the Service and the State met on December 6, 1955, to discuss their concern about the preservation of the flock and recommended that the goose season be closed effective at midnight, December 19, 1955, in a part of the counties of Chariton, Carrol, Livingston and Linn in Missouri. As of December 6, 1955, over 19,000 geese had been killed or crippled by hunters in this area. Of this total 7,000 were at the Swan Lake Refuge public hunting area *309 and 12,000 on the Fountain Grove State area and on private lands in the locality. At a meeting on December 8,1955, the Missouri State Conservation Commission adopted a resolution amending the Wildlife Code of Missouri, making effective the recommendation to stop the hunting of geese on December 20, 1955. The action was stated as having been taken “pursuant to the authority vested in it by the Constitution of Missouri * * *” and “in the public interest.” This decision was agreed between State of Missouri and Federal representatives to be wise and necessary for preservation of the flock. The action taken pursuant to the decision was also in accord with the cooperative agreement between the Service and the State of Missouri. Plaintiffs were notified of this action on December 9,1955.
17. Plaintiffs began closing down their concession on or about December 9, 1955. McGuire testified that plaintiffs had anticipated being able to operate until about January 10 or 12, 1956. He said that, at the time he was notified of the closing, the weather was extremely bad, the birds were starved and no one wanted them and it was necessary to winterize his property to protect it against the weather and there was just no reason to go to additional expense in training people to help operate the concession at that time. The concession, however, was not fully closed down prior to December 19, 1955. Plaintiffs voiced no complaint to the Service about the closing of the 1955 season effective December 20. J. S. McGuire was, in fact, much concerned about the prospects of the shooting season for 1956 on account of the 1955 experience of a heavy kill, and on June 14, 1956, wrote to the director of the Service about it, opposing any liberalization of hunting regulations until the prospects could be properly evaluated. In another letter also written after the close of the 1955 season and addressed on May 4, 1956, to the Missouri Conservation Commission, Mr. McGuire, although not referring specifically to the closing of the season, said: “I do not mean anything that I have said as criticism or condemnation of last year’s operations. I believe that last year’s operations were conducted with all of the fairness and efficiency that could ever be expected on the basis of the management experience available at that time. I do be *310 lieve that certain, lessons have been learned that may aid the situation this year.”
The narrative report of the Service for the 1955 season stated in part: “The public x-eacted favoidably to the closure December 19; 16 days early. Most took the attitude that the hunting season had been a good one, they had killed more birds than ever before, the season had run about as long as usual, and if we needed to close the season to protect the i’emainder of the flock, they were for it.”
18. Notwithstanding the severe weather, the condition of the birds and the heavy kill, interest continued until the season was closed on December 20, 1955. The first hunting season on the refuge was a subject of great public interest which remained at a high pitch throughout. The narrative report of the Service for the 1955 season stated in part:
There was a great hue and cry over the opening of a portion of Swan Lake Refuge to hunting. Public hunting on the Management Area was well publicized in advance of the season and, with 133,500 Canadas present on the refuge and scattered over the countryside for miles, interest was at fever pitch when the season opened. On the week-end prior to the opening, sightseers who had heard of tremendous flock of geese and the opening of a part of the refuge to public hunting by the media of radio, newspapers or television, tunneled into the area for a look-see from all over the state. An estimated 3,000 visitors stopped at Management Area headquarters on Sunday, October 23. A check count that afternoon l’evealed cars entering the refuge headquai’ters area at the rate of 69 per hour!
_ The Commission began accepting hunting reservations 15 days before the season opened. They received over 2,000 letters for blind reservations the first two days requests were accepted. Before the season opened all blinds were reserved through December.
As it developed, hunting success fell off so drastically the 'last 2 weeks of the season that it would have made little difference in the total kill had the goose season remained open until January 5, 1956. Plowever, the interest of hunters remained high, as noted above. There were 1,638 hunters who visited the refuge between the dates of December 10 and December 19, 1955. The highest number was 203 on December 11 and the lowest was 96 on December 16. The *311 average number of hunters for the 10-day period was 163.8. This compared with an average of 191.26 for the 53 days of the 1955 hunting season, October 28 through December 19
19. Plaintiff J. S. McGuire testified that he was damaged by the season having been shortened when he had been assured by the chief of the branch of refuges of the Service in November 1955, after he had started construction, that there would be a 70-day hunting season in 1955. He said that on such assurance he had accelerated construction. As a result of his own inspection of the Swan Lake Refuge, McGuire doubted that a 70-day season would be possible because it was his opinion that there was not sufficient food for the birds to keep them there that long. Defendant’s representatives testified that they could not have given any assurance of a 70-day season. On the contrary, Gillett had told McGuire in August 1955 that there would be only about a 55-day “period of use.” Plaintiffs had computed the amortization of their investment on such a basis. J. S. McGuire, an experienced hunter, knew there had not been any 70-day hunting seasons since the drought years of the 1930’s and that such a season would be “unusually long.” As an experienced hunter McGuire understood that the Missouri Conservation Commission had duties in connection with determining the length of the hunting season and inquired of the Commission about it. It is found that the weight of the evidence is that defendant did not give plaintiffs any assurance of a 70-day hunting season upon which they relied either to make the contract or to accelerate construction.
20. Pursuant to terms of the operating agreement between the Service and the Missouri Conservation Commission, a general information bulletin on the Swan Lake Refuge area was issued each year. The Commission prepared, printed and distributed the bulletin and the Service approved it. The document issued in August 1955 carries the names of both the Service and the Commission as “cooperating.” It is entitled “General Information & Regulations for Public Goose Hunting.” The bulletin states in part:
Public Hunting: The Swan Lake Wildlife Management Area will be open to public goose hunting concurrently with the opening of the statewide waterfowl season. Hunting shall be by reservation only, ex *312 cept that unreserved pits or blinds may be assigned on a first-come, first-served basis. Only geese will be legal game: ducks may not be shot. More than 100 blinds and pits * * * will be available * * *.
How the Shootmg Area Operates: Reservations will be made by blind or pit only. A fee of $5.00 per pit or blind will be charged. Not more than four hunters will 'be allowed per blind or pit. Reservations may be made by writing to the Area Manager, except that no advance reservations will be accepted prior to 15 days before the opening of the legal waterfowl season. * * *
How to Apply for Reservation: In order to obtain a reservation, write to the Area Manager, Swan Lake Wildlife Management, Missouri Conservation Commission, Sumner, Missouri. Give your name and address and number of hunters in your party. State the specific day on which you wish to hunt and also give some alternate days that will be acceptable to you.
AjREA REGULATIONS
1. No wildlife shall be pursued or taken in or from the Swan Lake Wildlife Management Area except as specifically permitted herein:
2. Geese only may be taken on this area in accordance with applicable law and these regulations.
3. Geese shall be hunted and shot only from a pit or blind constructed by the Commission and assigned by said Commission to the hunter or hunters for that specific day, provided that dead birds may be retrieved and down cripples may be pursued and taken within the hunting zone only. No birds may be retrieved on the refuge beyond the boundary of the shooting area.
4. Federal regulations shall apply as to limits and methods of taking geese provided that dogs may not be used or be permitted on the area.
;Jj & # # #

Miscellaneous Information:

* *■ * * *
4. No individual hunter may hunt on the area more than three times nor kill more than four Canada geese thereon during any one season, whichever is first, provided : persons excluded by the above rule may hunt on the area if there are available and unreserved pits or blinds and no other person is present who is not excluded by the above rule and who desires to hunt.

*313
General:

* * * # *
In 1955 the Fish and Wildlife Service set aside a portion of the refuge to be managed as a public hunting area by the Missouri Conservation Commission. Both agencies desire to distribute more equitably the harvest of Canada geese by providing the general public with a greater opportunity to hunt geese. The public hunting area covers approximately 2,500 acres of the 10,997-acre Swan Lake National Wildlife Befuge.
It is to be noted that the bulletin from which quotations have been set forth above was issued 4 days prior to defendant’s notice of August 12, 1955, inviting proposals for a concession at Swan Lake and thus prior to defendant’s submission to plaintiff on September 1, 1955, of a proposed contract which was negotiated and subsequently agreed to on October 5, 1956, but effective September 1, 1955. Thus, the bulletin contained no reference to plaintiffs’ concession which under the contract gave plaintiffs 3 years after September 1, 1955, within which to complete their facilities at Swan Lake.
21. The general information bulletin prepared by the Commission for the 1956 hunting season was submitted for approval to the regional director of the Service who noted that it was substantially the same as the one for 1955 and offered no objection thereto. However, it was suggested that something should be included to alert hunters to the facilities of Goose Hill Lodge. Specific language to do this was suggested by the Service but rejected by the Commission which did not wish to advertise commercial operators or do anything to favor one over another.
22. In July and August 1956 Mr. McGuire protested to the Service the proposed omission of the mention of his concession from the 1956 information bulletin. He expressed the view that there should be a reference to Goose Hill Lodge as an “official” concession or “Government-authorized” concession, to which agreement was indicated by the Service. McGuire expressed concern that his contract was with the Service, yet in a bulletin carrying the name and sponsorship of both the Service and the State the latter seemed to have a veto power over the language of the bulletin, which, in effect, *314 diluted tbe value of his contract and presented an appearance and fact .of intervention in the contract which kept plaintiffs from getting a mortgage on their newly built concession facilities.. He expressed the view, however, that he did not actually think that omission of Goose Hill Lodge from the bulletin would have a vital effect upon the use of his facilities. The Service representative with whom plaintiff McGuire talked expressed a reluctance to insist upon a change in the language of the bulletin as it was regarded by the Service as the primary responsibility of the Commission to get out the bulletin.
23. As issued for the 1956 hunting season, the general information bulletin was very similar to the one for 1955 but did contain some additional language including the following:
Horn to Apply for Reservation: * * *
All reservations are conditional and will not apply in the event of an early closure of the hunting season on this area or any other contingency which may invalidate the reservation.
•Js *1» $

Miscellaneous Information:

4. No individual hunter may hunt on the area more than two times during any one open season, provided persons excluded by the above rule may hunt on the area if there are available unreserved pits or blinds and no other person is present who is not excluded by the above rule and who desires to hunt.
* S: ‡ * *
8. Overnight accommodations and eating facilities are available in Chillicothe, Brookfield, Brunswick, and other nearby towns. There is also a private concession located on Federal lands adjacent to Area Headquarters which has overnight facilities, restaurant, hunters’ supplies, and a modern picking plant for ducks and geese.
24. In June 1956 the State Conservation Commission approved an administrative order which was issued in August prohibiting hunting 2 days in succession in the 1956 hunting season. This determination was made because of the very large number of hunters desiring reservations and in an effort to give as many of them a reservation as possible. In addition, to maintain discipline over the hunters *315 and to reduce hunting violations such as experienced in the 1955 season, the Commission prohibited hunters from leaving the blinds and returning to them to hunt during the course of the day. They could return with refreshments. The Service knew before the 1956 season opened that these administrative orders would be effective. Actually, 2 days of hunting were permitted individual hunters and these days could be in succession toward the latter part of the hunting season when interest in hunting had declined a little. However, for most of the season it was necessary for one who had already hunted to stand in line at 4:30 a.m. the next day, when the hunters were going out to the blinds from headquarters, to determine whether anyone who had a reservation had failed to appear. In such event there was a possibility that this vacancy could be utilized.
25. The net effect of the administrative orders mentioned in the finding above was not good for plaintiffs’ concession because there was little point in renting a room or staying for dinner when there was no assurance of hunting on the second day. These orders were adopted without consideration of the effect they might have on plaintiffs’ concession. Plaintiffs assert that part of their alleged damage occurred because these orders “pulled the rug from under” their lodging operation and sale of food. The Service had no record or clear recollection of any complaint about this situation from plaintiffs in 1956. The record shows, however, that plaintiffs did complain about these orders to the representatives of the Commission before closing an unprofitable season on December 23,1956.
These administrative orders did not affect hunting in the area served by plaintiffs’ facilities except at Swan Lake. To the extent that they did affect hunting at Swan Lake they adversely affected plaintiffs’ business except for picking-plant operations and sale of general merchandise.
26. Plaintiffs assert as one cause of their alleged damages that the Service before, during and after execution of the contract had a plan which was put into operation providing for reduction, dispersal and removal of the waterfowl population from Swan Lake Kefuge to other areas and that plaintiffs were unaware of said plan before execution of the con *316 tract. On June 21, 1956, which was before the execution of the contract on October 5, 1956, (effective as of September 1, 1955), the regional supervisor of the wildlife refuges of the Service wrote to plaintiff J. S. McGuire in part as follows:
We are attempting to distribute the Swan Lake goose flock by developing other areas north on the fly way. If these areas can be established, we believe it will be better for all concerned since it would tend to permit the geese to arrive at Swan Lake at a somewhat slower rate, prevent excessive build-ups, and permit reasonable shooting opportunities over a greater period of time over the season. Food supplies would also be conserved so the birds would tend to stay longer.
We do not wish particularly to build up a large wintering flock of geese at Swan Lake. We are inclined to believe that the winter goose flock will fluctuate from year to year, depending upon the weather and food supplies available. In other words, this might be considered a marginal wintering area where birds may stay or go on, depending on local factors.
* * * you may be assured that we are going to do our best to maintain a good healthy flock of geese at Swan Lake. I am certain that the State, too, will do all it can to give the public an opportunity to hunt under the most favorable conditions and at the same time maintain the flock at the optimum level.
The plaintiffs did not object in 1955-1956 to the policy of the Service as stated above. Plaintiff J. S. McGuire recognized the advantages of more than one refuge for geese on this flyway and in August 1955 recommended to the Service the establishment of one in southwest Missouri, south of Swan Lake.
27. The Swan Lake goose flock is not confined to that area but migrates seasonally between the Pludson Bay area and the Gulf Coastal area with some geese wintering at Swan Lake. The geese stop at Swan Lake and other places to rest and feed. The number stopping at any particular place and the length of time they remain is due to many factors such as food, weather, water, hunting and other considerations, some of which are beyond control of defendant. The counting of geese in a flock is not an exact science. It is done from time to time from an airplane. The count at Swan Lake in 1955 *317 showed that the “peak” number of. birds present at any one time during that season was just before it opened when there were approximately 133,000. It is a slow process to build up a flock. It took about 19 years to build up the Swan Lake flock to the point where hunting could be allowed. Absence of hunting and an abundance of food are important to success in this regard. In 1946 there were 10,000 geese in the Swan Lake flock. In 1947 there were about 25,000 birds in this flock. In 1950 there were 32,000 in the flock. By 1953 there were about 76,000. In 1954 the flock had grown to 104,000 and in 1955 it was 133,000, as noted above. The peak number of geese dropped to approximately 55,000-60,000 in 1956, and in 1957 it was 42,000. In 1958 the peak was 55,000. The Service considered that these figures represented a successful program and a good flock.
28. In the opinion of the Service, the decline in the peak number of geese during a season cannot be accounted for entirely by hunting, although the kill is substantial. The results of goose hunting in the 1955-1956 seasons at Swan Lake and nearby were as follows:
Year Number hunters Geese killed at Swan Lake Killed outside Crippled Peak counts
1955.. 10,137 7,716 15,000 143,000
1956.. 11,204 3,118 1,974 524 72,000
It is found that, while the peak number of geese declined in the Swan Lake flock after 1955 and the kill was less until 1958, the number of hunters did not decline in 1956. The total kill at Swan Lake and in nearby areas was 9,900 in the 1957 season and 25,000 in 1958. Both of these latter years showed kills in excess of the kills in the area before the refuge was opened in 1955. The kill in 1953 was 4,077 and in 1954 was 8,600. The evidence supports a finding that the cause of the decline in the number of geese at Swan Lake after 1955 was not accounted for by defendant’s efforts to distribute or disburse the flock, except to the extent that hunting allowed may have influenced the flock, ■ Because of the many factors which may influence waterfowl use of an area, it is impossible to try to evaluate this information with any precision. It is *318 a fact, however, that the plan of the Service to attract a part of the Swan Lake flock to areas farther north for a temporary stop-over and to discourage wintering at Swan Lake and for other reasons heretofore mentioned was a long-range plan that would have taken from 10 to 15 years to become effective and it had not affected the flock in the years 1956-1958. In fact, so far as hunting was concerned, the largest kill of the Swan Lake flock in any of the 4 years 1955-1958 was in 1958. The efforts of the Service on behalf of maintaining the size of the flock are reflected, in part, by the fact that it provided approximately 16,000 bushels of grain for the flock at Swan Lake in 1955 and 31,273 bushels in 1956. Geese of their own accord and for unexplained reasons do not always follow the exact same flight pattern from year to year.
29. On March 12, 1957, plaintiffs’ lawyer wrote to Robert W. Burwell, assistant director of the Fish and Wildlife Service, Minneapolis, referring to conversations which had been held in January 1957 between plaintiffs and their attorney and representatives of the Service in Minneapolis at which time the Service had been put on notice that plaintiffs would be unable to continue operation of the concession in the 1957 season due to financial difficulties with their other business ventures, lack of revenue from the concession and plaintiffs’ admission that they were in default. The letter asked that sections 9, 10 and 11 of the contract be put into operation and a determination made of compensation for the concessionaire’s interest. Cooperation in finding another concessionaire and transferring the assets of the contract were assured by plaintiffs. Plaintiffs made reference to the mechanics’ liens filed against them and to their desire to pay such claims as were legally due and to receive for themselves any amount above those claims.
30. R. W. Burwell, for the Service, replied to the above letter on March 19, 1957, indicating a tentative desire to locate a successor concessionaire in accordance with section 10(a) of the contract and asking that the Service be advised of the book value (investment less depreciation) of plaintiffs’ interest in the concession and requesting a statement of outstanding indebtedness which would form the basis for *319 a deposit by a purchaser of a part of the purchase price in an escrow fund.
31. On April 23,1957, plaintiffs’ counsel addressed another letter to the Service stating in part:
Copies of recent communications received by this office and correspondence regarding this matter to creditors of Mr. McGuire indicate some possible misapprehension as to whether or not there is a default. Please let me clear up any doubts on that matter now. The McGuires are in default on this contract and will continue to be in default. They will be unable to open the doors next fall and have known that fact for several months. In fact, it is for that reason Mr. McGuire and I came to Minneapolis the early part of March to meet with the officers of that particular region of the Department of the Interior. We desired to show our good faith by notifying you gentlemen promptly of the necessity of a default on the part of my client and to work out whatever problems might arise in the disposition of this matter.
_ The default has occurred not only by virtue of financial difficulties of my client but by virtue of various actions on behalf of the Department and of the Missouri Wildlife Commission which have tended to jeopardize my client’s position and operations under this contract.
*****
Again, with respect to the letter of March 19th, please be advised that the approximate book value (investment less depreciation) of the Goose Hill Lodge, under Contract 14 — 19-003-14-27, at the close of the calendar year ending December 31, 1956 is approximately $81,000.00. This figure includes approximately $6,000.00 of merchandise inventory. The actual value of the inventory and the property and equipment is considerably in excess of that figure. However, the contract under Section 10 provides for book value and we are again prepared to follow the contract in that respect.
The indebtedness against the corporation is approximately $44,000.00 in accounts payable, of which approximately $40,000.00 is involved in lawsuits at the present time and we are still prepared to set up the escrow arrangement previously suggested.
32. At the suggestion of the Service a meeting was held in the office of plaintiffs’ attorneys on May 8, 1957, at 1:00 p.m. at which time the Service was represented by Burwell, acting regional director; Gillett, supervisor of refuges for *320 region 3; Angelí, a Government attorney; and Meyer, regional administrative officer. Plaintiffs were represented by J. S. McGuire and attorneys Ross and Siegel. Plaintiffs’ creditors were invited to appear at the meeting at 2:00 p.m. and did so. At the first meeting on May 8, 1957, Ross declared that his clients were “broke” and that he wished to have them declared in default on the contract. Burwell understood Ross to believe that if plaintiffs defaulted for any reason defendant was obligated to buy or pay for the plaintiffs’ interest at book value. J. S. McGuire had entertained this idea since before entering into the contract. Gillett did not get the same impression on this point as Burwell did at the May 8 meeting. In any event, the Service did not agree to this view. The Service did agree that plaintiffs were in default. This was the advice of Angelí to Burwell at the meeting, although Burwell personally felt at the time that plaintiffs had abandoned the contract. The Service also agreed to help plaintiffs try to find an acceptable successor concessionaire within 90 days or by September 1, 1957, so that the concession could be put in operation for the 1957 hunting season since plaintiffs could and would no longer operate it. If a successor acceptable to both parties could be found, then a termination of the contract was to follow. The question of what would happen in event of failure to find a successor concessionaire was mentioned by Burwell at the meeting. The matter was not discussed in any detail. There was no agreement by the Service to discontinue operation of the concession if a successor concessionaire could not be found. There was no agreement that the defendant woul d pay plaintiffs for their investment in such event or at such a time or that plaintiffs would be released from their contract, or that the contract would be declared terminated as of either May 8 or September 1,1957.
33. Burwell was the authorized representative of defendant to administer the contract in issue. He did not consider that he had any authority, however, to pay plaintiffs for their interest in the concession or to terminate the contract or modify it and made no promises to do so. The contracting officer who signed the contract was the director of the Fish and Wildlife Service, Washington, D.C.
*321 34. When the creditors met with the parties on May 8, 1957, they were told by plaintiffs’ counsel that plaintiffs were in default on the contract, that the parties had agreed to try to find a successor concessionaire who would buy out the plaintiffs’ interests on or before September 1, that plaintiffs would advertise the facilities in an attempt to locate a successor and that in event of a sale the money would be put in an escrow account to be established by plaintiffs from which the creditors would be paid and plaintiffs would get anything left over. There was no promise by the Service of how the creditors would get the money due them if there was failure to find a successor concessionaire.
35. On May 21, 1957, plaintiffs’ counsel wrote to the Service stating that, since it had been made obvious to the Service at the May 8 meeting that plaintiffs were in default, formal notification by the Service of that fact to plaintiffs under the contract should be made so that plaintiffs could commence the search for a successor concessionaire. Action was requested.
36. On May 23, 1957, the Service responded, admitting responsibility for delay and advising that on that date a letter was going forward by certified mail charging default in performance of the contract by plaintiffs under section 9 of the contract. It was stated that plaintiffs were expected to waive their right to be afforded a hearing on the charge of default in line with advice informally given the Service on this matter. The Service also stated that in the conference of May 8 it was understood that there would be advertising for a new concessionaire upon a finding of default and upon termination of the contract but that a prospectus of the concession plaintiffs had agreed to furnish had not been received. It was suggested that this prospectus would be helpful in preparing advertising and it was requested.
37. The Service did mail a formal notice to plaintiffs pursuant to section 9(a) of the contract on May 23, 1957, charging plaintiffs with substantial default in performance and stating that action thereon would be withheld for 30 days to give plaintiffs opportunity to be heard if they desired. The default specified was stated in the following two counts:
*322 1. Through your attorney, John A. Boss, and in his letters of March 12, 1957 and April 23, 1957 and in his verbal statements of February 26,1957 and May 8,1957, you have declared that you will not operate the concession at the Swan Lake National Wildlife Refuge in Chariton County, Missouri during the fall goose hunting season in 1957 or thereafter under the terms and conditions of the contract and that by this declaration you intend to be in default in meeting your contractual obligation under Section 2 and elsewhere in the contract to operate a concession. This action is construed to be an admission of default before the fact and to be sufficiently substantial to warrant an allegation of default requiring action at this time under Section 9 of the above cited contract.
2. Under the terms of Section 5 of the above cited contract, you are required to pay or cause to be paid to the Fish and Wildlife Service three percent (3%) of the gross receipts of the concession within thirty days following the close of each quarterly period after September 1, 1955. Records of this office show payments thereunder made through the quarter ending November 30, 1956 and the sum of approximately $89 due the Fish and Wildlife Service for the quarter ending February 28, 1957 and as yet unpaid. In verbal statements on May 8, 1957, you and your attorney stated that this sum will not be paid. Accordingly, default is alleged with respect to meeting your obligation under Section 5 of the contract.
38. Plaintiffs’ counsel, on May 27, 1957, acknowledged receipt of defendant’s two letters of May 23, admitting default, waiving a hearing as to the fact of default and promising early submission of the prospectus referred to above. The default was described as not due to willful and deliberate failure but “upon various circumstances which have occurred which render the concessionaires financially unable to continue.” The letter contained the following paragraph :
Pursuant to our agreement of May 8, 1957, this office will delay any demand for compensation under Section 10 of the contract for a period of 90 days, commencing June 1,1957, so that mutual efforts on behalf of the concessionaires and the Fish and Wildlife Service may be made to locate a successor concessionaire who can and will purchase the interests of J. S. and G. B. McGuire.
*323 39. Upon consideration of plaintiffs’ letter of May 27 the Service on June 7, 1957, directed a formal notice to plaintiffs declaring them in default, in conformance with section 9 of the contract. Plaintiffs were given 30 days in which to remedy the default or to advise the Service of assurances of action that would remedy it. It was stated that failure in these particulars would be cause for action under section 9(e) of the contract. The latter section authorized the director of the Service to declare the contract terminated “upon such date or upon such contingency as he may deem proper to protect the public interest, provided that such termination of this contract shall not terminate or impair the Conces-sioner’s ownership in improvements.”
In a letter dated June 6, 1957, to plaintiffs’ lawyer, referring to the notice of June 7, the Service stated, “We do not intend to formally declare the contract terminated until we are in receipt of a reply to our letter of this date to the McGuires.” The Service noted, also, that the prospectus requested of plaintiffs had not yet been received. It was sent to the Service on July 2,1957.
40. On June 18, 1957, plaintiffs’ attorney advised the Service that the plaintiffs waived any hearings under the terms of the contract and authorized the written notice of default under section 9 (e) of the contract.
41. On July 11, 1957, plaintiffs signed and their lawyer sent to all creditors and to the Service a proposal contemplating signature and agreement of all creditors to share in an escrow fund which would be established through the receipt of funds for plaintiffs’ concession following termination of the contract. This letter explained the escrow proposal in detail and contained, in part, the following statements:
We feel that as a creditor of J. S. and G. B. McGuire, d/b/a Goose Hill Lodge, Sumner, Missouri, that you are entitled to know the current status of the business and the possibility of payment of your account.
Under the terms of the contract with the United States Department of the Interior, Fish and Wildlife Service, termination of said contract has been effected by the Wildlife Service with the consent of and at the request of Mr. and Mrs. McGuire. The provisions of said contract provide for a means of compensation to the concessionaires for their interest in the facilities which *324 they constructed upon the Government property at Swan Lake National Wildlife Kefuge.
A settlement under the contract has, by agreement-of the parties, been postponed temporarily in an effort to locate a buyer for the concession from McGuires, rather than requiring the payment by the Fish and Wildlife Service from their budget of the sums due the concessionaires.
Either by sale or by contract provision it now appears that there will be not only sufficient funds to pay all creditors in full, but to provide a surplus above and beyond the debt requirements.
42. Upon receipt of the letter of July 11, 1957, Burwell, for the Service, responded on July 23, 1957, in pertinent part as follows:
We presume that the copy directed to this office was provided merely as a matter of information and that it was not intended that we execute it and return it to you even though the McGuires are indebted to this Bureau for a payment under Section 5 of the contract. An extra copy was not provided for this purpose. Neither would it be necessary for such an agreement or understanding to be executed since the Government has collection procedures and does not need to be further bound by any specific agreements except as may be entered into to prescribe relaxed terms of payment, such as, in installments.
One thing about the notice disturbs us somewhat. We have reference to your phrase “rather than requiring the payment by the Fish and Wildlife Service from their budget of the sums due the concessionaires” and to related phrases on pages 1 and 2 of the letter. We are wondering if you aren’t being somewhat premature in statements of this kind, and would wish to reconsider the use of them in the future.
We do not believe that, under the present status of this matter, it can be held that the Service is liable for compensation to the concessionaire for his interest in any event. Such liability may exist, though we are not ready to agree that it does, under Section 10(b) of the contract if a determination were made to discontinue the operation of the concession. Since no such determination has been made, Section 10 (b) is not applicable. As you know, we have decided to continue the operation of the concession and this decision requires application of Section 10(a) of the contract with regard to the liquidation of the concessionaire’s interest. Sec *325 tion 10(a) cites no obligation on the part of the Service, but only spells out the requirement that the concessionaire “will sell or transfer” his interest “to the successor designated by the Service” Such successor, as the section indicates, may be either a private person or an agency of the Government. The “agency of the Government” cited here is not necessarily this Service, but may be one with whom the Service would negotiate, as with a private person, to become the successor concessionaire. At any rate, the Service has the right of designation, and obviously will endeavor negotiation with a private person and will designate him as successor in the event of successful negotiation.
As we have previously stated, we intend to cooperate with you in this matter and exert every effort to locate a successor. If the process is delayed for any reason, it may be necessary to invoke the provisions of Section 10(c) of the contract.
On July 25, 1951, the Service wrote plaintiffs’ lawyer advising that preparation of an advertisement for a new concessionaire was proceeding but that the Service was disappointed in the failure of the prospectus furnished by plaintiffs to contain a detailed description of available facilities and because it contained “a few slight exaggerations.” The letter stated further:
- We have today directed a formal notice to the Mc-Guires, in your care, of the termination of the above-cited contract. This action culminates the process of dealing with the default of the concessionaire and opens the way for proceeding toward the location and selection of and negotiating a contract with a new concessionaire.
You will note that the termination is effective and contingent upon the establishment of a new contract. Setting the effective date in this manner is permitted by Section 9(e) of the contract and was considered necessary in order to protect the interest of the Service and of the public. We believe you will understand that it would not be in our interest to arbitrarily set a specific termination date.
43. On July 25, 1957, the Service again wrote plaintiffs that in view of the advice in the letter of June 18,1957, from their attorney on their behalf that plaintiffs were in default for the two reasons about which plaintiffs had been formally *326 notified on May 23, 1957. The letter concluded with this statement:
Accordingly, and pursuant to Section 9(e) thereof, this office, acting under the delegation of authority by the Director of October 5,1956, hereby declares Contract No. 14^19-003-1427 terminated effective upon the date of and contingent upon the execution of a new contract with whomsoever is designated by the Fish and Wildlife Service to succeed to your interest in the concession.
44. Plaintiffs did not agree with the contingent termination as declared by defendant. On July 29, 1957, they advised the Service, through their counsel, of this attitude, stating in part:
While Section 9 (e) of the contract provided that “the Director may declare this contract terminated upon such date or as upon such contingency as he may deem proper to protect the public interest,” we feel that the contingent termination is so evasive as to an effective date that it transcends the question of protecting the public interest and constitutes an imposition upon the concessionaires not contemplated under the terms of the contract. Under the procedure which you have elected to follow, this contract can be held open for an undetermined time solely to prevent payment to the concessionaire. We do not feel that such action is proper either under the public interest provision or under any terms of the contract whatsoever. We sincerely hope that this was not the intention of your Department in making the termination so indeterminable as to date.
‡ $
We can see some justification for your position but we cannot agree to an extended delay in termination of this matter which may reach into months or even years, which would result in a detriment to my clients as well as to the creditors.
For all intents and purposes, this office on behalf of our clients consider the contract terminated immediately but will continue to cooperate with your office in securing a successor concessionaire by September 30,1957.
Plaintiffs said that they had an agreement with the Service to forego claims under the contract until September 30, 1957, while advertisement was made for a successor concessionaire. If the search for a successor was unsuccessful it *327 was stated that plaintiffs did not propose to be bound by the contingent termination as set forth by the Service.
45. On July 31, 1957, a new public notice offering the Swan Lake concession to a new concessionaire was issued by the Service. The notice described the motel and dining room and other facilities and stated that the book value of the concessionaire’s improvements were $81,000 including a merchandise inventory of about $6,000. It was stated that this did not necessarily mean the fair value or the price that might be negotiated or agreed upon. The public notice contained some additional inducements which plaintiffs had suggested as desirable for the success of the enterprise. Paragraph 4 of the notice read as follows:
4. OPTIONAL facilities. The facilities set forth in Item 3 above were designed to provide sleeping accommodations, meals, hunting supplies, and waterfowl dressing facilities to hunters during the fall hunting season. The Bureau will approve the expansion of these facilities and services by the concessionaire to provide for the sale or rental of boats, the sale of lunches, beer, soft drinks, candy, tobacco, souvenirs, fishing tackle and bait and such other related items as may be appropriate. These additional services, as well as lodging and meals, may be extended through the hunting season and/or the fishing season or any other periods of recreational use of Refuge and nearby areas as determined desirable by the concessionaire and the Bureau.
46. One of the major creditors inquired of the Service on August 30, 1957, about the prospects of sale of Goose Hill Lodge. The Service replied that nothing tangible could be offered about a successor concessionaire and that no firm proposal had been submitted as a result of the public notice inviting proposals to negotiate for the concession. The Service stated further:
We have not yet decided on a course of action should the current effort fail. However, it is obvious that we shall have to make some decision by the middle of September as to whether or not it would be in the interest of the Government to continue operation of the concession so that all parties concerned can take whatever course of action that may be indicated.
*328 No creditor has made any demands upon the Service as a result of any -understanding reached at the May 8, 1957, meeting, as alleged by plaintiffs, that defendant would assume plaintiffs’ obligations or buy the plaintiffs’ interest in the concession in event of failure to find a successor concessionaire.
47. The Service wrote to plaintiffs on September 18,1957, that it was still trying to find a successor concessionaire but that it was becoming evident it could not be successful in time for the opening of the 1957 waterfowl hunting season. Section 10(c) of the contract was referred to wherein to avoid interruption of service to the public upon termination of the contract for any reason the concessionaire would, on request of the Service, continue to operate for a reasonable time to allow the Service to select a successor or consent to use by a temporary operator of the concessionaire’s improvements upon fair terms. The Service had no temporary operator in mind but pursuant to the contract believed it necessary to seek plaintiffs’ consent for use by a temporary operator. The Service admitted that it did not expect plaintiffs to operate the concession further.
48. On September 17, 1957, the counsel for plaintiffs replied to the letter of September 13,1957, advising that plaintiffs considered that they had carried out all provisions of their agreements of May 8, including a waiting period of 90 days and an additional 30 days to search for a successor. Plaintiffs requested negotiations under paragraph 10 of the contract for compensation for their interest from defendant and, in event the Service was unwilling to negotiate, then plaintiffs said they would invoke the provisions of section 10(a) for arbitration to determine the fair value of their interest. Plaintiffs stated that they had turned the keys and possession over to the Service, their interest was terminated, only payment by defendant remained, and the Service should take care of the expiring insurance on the facilities.
49. On September 18,1957, the Service responded to plaintiffs’ letter of July 29. The Service indicated that it felt it had to make the termination effective on a contingency basis, that this action made the actual date indeterminable if the Service should choose to make it so but that the contract *329 provided tlie right to bold plaintiffs responsible for the concession until it was transferred to another or until it was determined that another could not be found. In the latter event the termination could be amended to fix a firm date if found to be for the convenience of the Government and in the public interest. The term “public interest” as used by the Service was described as its desire to avoid an outlay of taxpayer’s funds, to continue the operation as a service to the public and to hold the contractor to his responsibilities. Anything the Service did as a Government agency was stated as presumptively in the public interest. The search for a new concessionaire was described as slow but two prospects were to be interviewed shortly.
50. By letter of September 23,1957, plaintiffs rejected the position taken by the Service as expressed by it on September 18. Plaintiffs said that an indeterminable termination on a contingency basis under the contract was legally ineffective and that the contract had, in fact, been terminated without contingency. Plaintiffs again demanded that the Service enter into negotiations for the determination of the purchase price plaintiffs believed the Service owed them for their interest. Reference was made to the belief of the Service that it might be able to find a successor concessionaire and 2 additional weeks were suggested as a reasonable time to do so after which it should be concluded that it could not be done in the 4 months expended for this purpose and the Service should then pay plaintiffs.
51. In another letter of September 23, 1957, plaintiffs, through counsel, commented upon the letter from the Service on September 13 and indicated unwillingness to proceed under the provisions of section 10(c) of the contract as the Service had suggested. Plaintiffs said that as the contract had been terminated, in their view, and the keys and possession of the premises had been delivered to the representative of the Service at Swan Lake, it was now the responsibility of the Service to operate it and pay for it. Plaintiffs said that they had complied fully with section 10(c) in affording time to seek a successor concessionaire; . 7
52. On September 23,1957, the Service wrote to plaintiffs’ counsel taking exception to the position of plaintiffs as.stated *330 in various letters heretofore referred to. The Service reiterated its own position previously expressed, advised plaintiffs that the Government does not purchase insurance for protection of its holdings but that, in any event, the Service did not by accepting the keys to Goose Hill Lodge accept possession thereof. The keys were accepted, it was stated, for the sole purpose of facilitating the showing of the premises to prospective concessionaires. The Service refused to enter into any negotiations for payment by defendant to plaintiffs on the grounds that such procedure would not be in accordance with the terms of the contract and defendant’s position as stated in its letter of July 23,1957. The Service, consistent with its position, later refused to pay certain electric bills forwarded to it at plaintiffs’ suggestion by Consumers Public Service Company for service to October 10. The Service cautioned plaintiffs to protect plumbing at the lodge from damage due to freezing. Plaintiffs refused to pay the electric bills or to attend to the heating of the premises.
53. In October 1957 plaintiffs requested a review of the dispute by the officials of the Department of the Interior in Washington, D.C. Such a review was the subject of letters from the Department to plaintiffs on January 3, January 27, and October 15,1958, wherein defendant reasserted its previously expressed position that efforts should be continued toward finding a successor concessionaire, that none had been found but that the search continued, that this was complicated by the provision of the contract relating to the buy-out of the plaintiffs by a successor concessionaire but that defendant considered an effort in this direction as the limit of the obligation of the United States and specifically that the latter did not owe plaintiffs anything as it was plaintiffs who had defaulted and admitted their default on the contract.
54. Both parties made sincere and diligent efforts to find a new concessionaire who might pay fair value for the concession but their efforts were not rewarded with success. Three individuals showed an interest in the proposition in September 1957 but their offers ranged from $20,000 to $35,000 and were unacceptable to plaintiffs. No successor concessionaire was ever found who could and would comply *331 with the provisions of the contract as to the terms of payment required by the plaintiffs. There was no attempt to arbitrate fair value under section 10(a) of the contract. The concession facilities built by plaintiffs were not reopened by plaintiffs for the 1957 hunting season and have not been used since. Plaintiffs could and would not operate due to financial difficulties and admitted default. Plaintiffs would not permit the Service to designate a temporary operator to use their facilities. The Service has made no determination, however, that it is desirable to discontinue the concession. The Service has considered that if the property looked to be in good condition and if it were operated even temporarily that it would be easier to sell. Accordingly, it has performed some routine maintenance since plaintiffs have refused to do so, but has not, due to plaintiffs’ refusal to consent thereto, operated the facilities constructed by plaintiffs nor opened them in any way to the public.
55. In November 1957 plaintiffs wrote the Service that they understood a successor concessionaire had been allowed to move onto the premises and to operate from a trailer. This was without notice to plaintiffs. On October 11, 1957, the Service did issue a Special Use Permit for a fee of $50 for operation of a portable trailer-type refreshment stand to the Missouri Conservation Commission. The permit authorised sale to the general public of “such foods and beverages, confections, tobacco, and other items normally offered in a restaurant business; shotgun shells; but shall not sell or serve any alcoholic beverages. All costs of operating the stand will be borne by the permittee.” When it was evident plaintiffs would not reopen, the trailer was operated in the 1957 hunting season on land owned by defendant but leased to the Commission previously as a part of the so-called state headquarters area. The trailer stand was adjacent to the administration building of the Commission. The person who operated the trailer stand under the permit to the Commission testified that it was not successful financially and it was not operated by anyone after the 1957 season. This operator sought to buy plaintiffs’ concession but did not make an offer acceptable to plaintiffs. None of the facilities constructed by plaintiffs were used as a concession in the 1957 hunting sea *332 son. There were no sleeping facilities available in that season. Hot dogs, coffee and sandwiches were served bnt regular meals were not prepared. Sweet rolls, doughnuts and coffee were served for breakfast. No payments under this arrangement were made to plaintiffs either by the Service or the Commission. No mention of any concession was contained in the 1957 annual general information bulletin published jointly by the Service and the Commission.
56. Plaintiffs’ operations for the year 1955 grossed $1,546.51 but resulted in a loss of $4,578.85. Plaintiffs’ operations for the year 1956 grossed $11,251.19 but resulted in a loss of $12,317.62. No losses are claimed for any subsequent year or portion of a year.
57. Plaintiffs’ book value investment in the facilities at Swan Lake, less depreciation, amounts to $72,210.07 as of December 31, 1956. Plaintiffs claim this sum together with the losses for 1955 and 1956 in the sum total of $89,106.54. It is found that plaintiffs’ losses in 1955 and 1956 were not in fact the fault of defendant. Whether or not plaintiffs are entitled under their contract with defendant to the recovery of the additional amount claimed is a matter of law.
58. Defendant 'asserts a counterclaim for routine maintenance of the facilities constructed by plaintiffs after they ceased to operate their concession. Defendant expended $745.56 for this maintenance.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover and the petition is dismissed.
It is further concluded that defendant is not entitled to recover on its counterclaim against plaintiffs and its counterclaim is dismissed.

 The writer Ras long been an advocate of conservation of our natural resources, having been joint author of tbe act establishing tbe national “Soil Conservation Service” and other conservation measures. He lays no claim to being an expert on migratory waterfowl. He remembers as a boy the fascination of watching their high and distant flights in a two-winged formation headed by a leader, and the occasional chance to fire a BB gun when they came close which usually only made them fly faster and honk a little louder, but, according to a skiUed ornithologist whom he is privileged to know on the Eastern Shore of Maryland, so long as the wild geese, along with the whistling swan and great blue heron, are permitted to go south in the fall and north in the springtime, and are protected in refuges along the line of flight where only limited hunting is permitted under regulation and permits, there will be an abundance of this form of wild life.
This is the primary purpose of the Migratory Bird Treaty and of the state and national laws enacted to implement its provisions and carry out its objectives.
This is the basic thought behind all our laws which provide conservation policies to prevent the depletion of our natural resources and keep them not only for ourselves, but for our children of the future. It is difficult to visualize responsible officials who are charged with any phase of conservation signing a contract which could by any possible construction mean what plaintiffs insist this contract means. The wording of the contract does not support such a construction and the f.acts of record do not support it. We do not believe it should be so interpreted.