SMITH v. ROYAL INS. CO., Limited.
No. 19382.

District Court, N. D. California, S. D.
Dec. 9, 1933.

James M. Hanley, of San Francisco, Cal., for plaintiff.

Percy V. Long and Bert W. Levit, both of San Francisco, Cal., for defendant.

KERRIGAN, District Judge.

The plaintiff is suing upon a policy of insurance in the sum of $15,000 upon his "leasehold interest" in certain real property on the shore of the town of Belvedere. The company refused payment of the policy on the ground that the plaintiff had no lease of the property and no insurable interest therein, which was the sole defense relied on at the time of the trial.

The nature of plaintiff's tenure of the property is most unusual and can only be understood in the light of a full statement of the facts. Plaintiff was the owner of a valuable house of considerable beauty known as "The Anchorage" and regarded as one of the show places of Belvedere. The house stood on land of which he was not the owner. This house was built by Hugo D. Keil prior to 1896 when certain dealings in connection with the land were commenced, a transaction which will be discussed in detail later. In 1910 Keil deeded the house to a Mrs. Bland; in 1928 plaintiff purchased the house from the trustee under the will of Mrs. Bland. Both deeds passed title to the house with its appurtenances, wharf, float, and outhouses; but neither deed makes any reference to any leasehold or other interest in the land upon which the property is located.

The house, as shown by maps introduced in evidence, stood in part on property which originally belonged to the Belvedere Land Company, and in part on property which

originally belonged to a man named Coleman. All of this property now belongs to the town of Belvedere. There is no evidence as to the terms of the agreement of lease between Keil and the Belvedere Land Company. It is apparent that there was such an agreement, for Keil invested his capital in the construction of the house. On September 14, 1896, at a meeting of the Belvedere Land Company, a corporation, a resolution was adopted expressing the intention of deeding certain water-front land to the town of Belvedere if and when it should be incorporated "to be held by the town in trust for the use of all its people as a general public beach or parkway," upon certain conditions and reservations. On March 12, 1897, the town having been incorporated, the deed was executed and was subsequently recorded. In the deed the resolution of intention was quoted and the deed was made expressly subject to the reservations and conditions of the recited resolution, providing further that if any of the conditions be at any time broken the title to the property would at once revert to the Belvedere Land Company. The reservations and conditions that are material to this controversy are the following: The reservation "of all rents collected by the said town for the use of any portion of said strip of land and particularly of the land rents paid by the owners of the Keil, Crocker and Magill cottages and the owners of the Red and White Cottages." The condition "that no private structure other than private wharves, boat houses or bathing houses * * * shall be permitted to stand wholly or partially upon said land and that neither of the five private residences or cottages now standing upon said beach shall be renewed in case of destruction by fire or otherwise and that said cottages shall remain thereon as long and subject to such conditions as shall be determined by said town." The condition "that if any of the conditions of this grant when made are violated the said strip of land shall revert to the company."

The deed was formally accepted by the board of trustees of the town. A search was made of the minutes of the board of trustees of the town of Belvedere, and no record was found of any reference to the terms of any lease of the land upon which the Keil or other cottages stood. In July, 1898, the town marshal was instructed to post a notice to the effect that no structures might be erected or arks or sailing craft moored or beached on this property. In June, 1899, there was another reference to this property and the tide lands adjacent to it. In a resolution the board of trustees recognized the rights of the owners to the wharves privately constructed as well as the rights of the public to the use of the beach and wharves, providing that the owners might not shut off the wharves from public use by gates, etc., but might construct gates barring the public "at such points as said wharves, or the approaches to them, join private property." The public was given the right of passage over the wharves, but not the right to moor boats or store property on the privately owned wharves. I mention this in detail because it shows the disposition to recognize the rights of the owners of structures on the public land to remain there and receive certain protection.

October 3, 1928, we find the next reference to the property, when the plaintiff was granted a permit to make extensive alterations and repairs to the cottage. Pursuant to this permit, he spent a large sum of money, approximately $25,000, in improving the house and garden. May 6, 1929, plaintiff's application for a permit to build a garage was refused on the ground that it was a new structure and the deed prohibited the erection of any new structures on the land. Plaintiff paid the taxes on the house and improvements and paid a monthly rental of $3 for the ground directly to the land company, to which it was reserved. This was apparently the rent that had been paid by plaintiff's predecessors. It was paid to September 30, 1932, and was paid more than four months in advance when the house was destroyed by fire May 17, 1932.

The other piece of real property upon which the structures belonging to plaintiff stood was known as the Coleman water lot No. 21, which adjoined the lot just referred to. In 1909, a lease of this lot was executed by the trustee of the Coleman estate to Keil. It was a year to year lease for an annual rental of $1 with a clause that the lessor might terminate it at any time upon thirty days' written notice. This lot was included in a purchase of property by the town of Belvedere in 1924 to provide a place for the public mooring of water craft, the funds having been provided by a bond issue.

In 1929 plaintiff took out various policies insuring the house and its contents against fire, earthquake, etc. July 12, 1929, plaintiff received the policy of insurance in question executed by defendant company. It is what is known as a *valued* policy in the sum of $15,000 upon plaintiff's leasehold interest in the property. It provided in substance that if the house were destroyed by fire and the lease canceled for that reason and no

re-lease could be obtained, that the whole of the insurance should be payable to plaintiff. It further provided that there should be no loss payable "except as a result of fire of sufficient extent to cause the cancellation of the lease." The circumstances under which the policy was written will be discussed later in connection with the admissibility of the testimony concerning it.

May 17, 1932, the house and adjacent structures were destroyed by fire. It is conceded that it was a total loss and operated as a forfeiture of plaintiff's right to maintain a structure upon the lands under the terms of the deed of 1897. Plaintiff asked the town for permission to rebuild the house, and permission was refused on the ground that to grant it would cause the property to revert to the Belvedere Land Company. Plaintiff also sought permission from the land company, the reversioner under the deed, and it likewise refused.

 It is apparent that plaintiff did not have what is commonly known as a "lease," namely, a written agreement for the hiring of real property for a fixed term at an agreed rental. It is equally apparent that plaintiff had a valuable interest in the occupancy of the land. The question here is: May this interest be described as a leasehold interest and as such be protected by insurance? It is my view that under all of the facts and circumstances of this case it may be so described and protected.

The term "lease" has a broader meaning than the one referred to. It has been defined as "a species of contract for the possession and profits of lands and tenements, either for life, or for a certain term of years, or during the pleasure of the parties." 3 Words and Phrases, Second Series, 54; Stone v. City of Los Angeles, 114 Cal. App. 192, 299 P. 838; In re Barnett, 12 F.(2d) 73 (C. C. A. 2); Asher v. Johnson, 118 Ky. 702, 82 S. W. 300; Harvey Coal Co. v. Dillon, 59 W. Va. 605, 53 S. E. 928, 6 L. R. A. (N. S.) 628. It accordingly includes a lease for an indefinite term as well as a lease for a definite term, a tenancy from month to month orally agreed to as well as a long term tenancy under a formal written instrument. An essential of a lease as distinguished from a license is that it gives a right of possession of the real property as against even the landlord. Shaw v. Caldwell, 16 Cal. App. 1, 115 P. 941; 3 Words and Phrases, Second Series, 57 and cases there cited.

 Since the term "lease" or "leasehold interest" is capable of describing a number of different types of tenancy, it becomes important to know in what sense the words were used in drafting the insurance policy in suit. The introduction of evidence as to the conversations and dealings between plaintiff and his insurance broker on the one hand, and the officers and agents of the insurance company on the other, was vigorously objected to by the defendant on the ground that it was for the purpose of varying the terms of a written instrument by parol evidence. In the federal courts, the parol evidence rule is strictly followed in insurance cases and is the foundation of the rule established by the United States Supreme Court in Lumber Underwriters v. Rife, 237 U. S. 605, 35 S. Ct. 717, 59 L. Ed. 1140, that an express provision in a policy may not be waived by introducing parol evidence to show that the insurer knew at the time the policy was issued that the provision was being violated. The rule is otherwise in California (see Waiver and Estoppel in Insurance Law in California, by Stephen I. Langmaid, 20 California Law Review, 1); but since insurance cases are considered matters of general jurisprudence, the principles as stated by the federal courts are controlling. Were the terms "lease" and "leasehold interest" narrowly defined and restricted to a tenancy for a long term under a written lease, the fact that plaintiff had no written lease would bar his recovery. It would be immaterial that the defendant knew at the time the policy was written that plaintiff had no such formal lease and testimony introduced to show defendant's knowledge of the fact would be inadmissible. Since, however, the terms are broadly defined to include a number of different kinds of tenure, it is necessary to know in what sense the parties used the term. Where a term is used in a written instrument in a connection where more than one meaning may be given to it, it is elementary that parol evidence may be introduced to show the sense in which it was understood to be used by the parties. The evidence was admissible for this purpose.

Prior to applying for the leasehold insurance, plaintiff's broker procured a search of the title from the local title insurance company, doing so on plaintiff's instructions. The first report stated that they found no lease of record from the town of Belvedere to plaintiff. It contained no mention of the deed of 1897 from the Belvedere Land Company. A second report disclosed this deed and summarized its pertinent provisions. The whole situation concerning plaintiff's interest was disclosed to the officers of the insurance company by plaintiff's broker, and

their advice and assistance were sought as to the wording of a policy which would cover plaintiff's unusual interest. The officers consulted were men with authority to bind the company. There is some conflict in the testimony as to just what instruments were shown the officers of the insurance company. It is conceded that the deed of 1897 was left with the company for several days. I believe and find that the whole situation concerning plaintiff's occupancy of the land was fully disclosed to them by plaintiff's broker. No form of policy which they had fitted the situation, and it was found necessary to work out what was referred to as a "tailor-made policy." Apart from the testimony of the broker, there is a clear inference that the insurance company knew that there was no lease with a fixed term. A preliminary draft of certain provisions was submitted by the company, and after corrections by plaintiff and his broker, the policy was written. The changes made from the preliminary draft indicate such knowledge. As an instance, the clause referring to a lease of a specific date was stricken and the policy as drawn was more general in its terms referring simply to a lease of land for which there is paid a monthly rental of $3. The fact that a valued policy was written instead of the usual form of leasehold insurance where the amount of insurance decreases as the lease advances toward its termination supports this conclusion. The insurance company through its agents knew the circumstances surrounding plaintiff's tenure before the policy was executed and the terms lease and leasehold interest were used to describe it.

Not only were the terms "lease" and "leasehold" used with the intention of describing plaintiff's interest in the real property, but under the law they properly described it. It is true that both as to the Coleman "water lot" and the Belvedere Land Company property, plaintiff's tenancy was legally subject to termination by the board of trustees of the town on thirty days' written notice. As to the Coleman property, Keil's lease was subject to termination on thirty days' written notice, and plaintiff stood in no better position than Keil. The clause in the deed of 1897 making the rights of the owners of the mentioned cottages to remain on the land terminate on the destruction of the cottages, made the right also subject to termination by the action of the town. Doubtless the town had the power to demand the removal of plaintiff's structures upon legal notice. It was a power that was not used so long as the structures remained undestroyed.

It is implied in the record that the other cottages held under similar conditions have never been removed. The town manifested its intention of not exercising its power when it granted permission to make extensive alterations and invest more capital. Had the power been exercised prior to the fire, it would have been practically a confiscation of plaintiff's rights in the house and other structures. The lot was a hill lot, and it would be difficult, if not impossible, to remove the house from it without making it worthless. Had the fire not occurred, it is apparent that plaintiff's occupancy would not have been disturbed during the life of the policy.

Plaintiff's occupancy of all the property except the land under and leading to the wharf was that of a lessee and not a licensee. He had a right of possession good against the world and good against the town until the expiration of the period after legal notice to terminate the tenancy. See Shaw v. Caldwell, supra.

The fact that an interest in property is uncertain in duration does not deprive it of insurability. In general, one who has an interest in real property subject to termination at his death may, if he takes out insurance for his own benefit and pays the premiums, insure it, and in the event of its total destruction, collect the whole amount of the insurance. It is immaterial that he may be in ill health and may die in the near future. Merrett v. Farmers' Ins. Co., 42 Iowa, 11; Trade Ins. Co. v. Barracliff, 45 N. J. Law, 543, 46 Am. Rep. 792; Rayner v. Preston, 18 Ch. D. (C. A.) 1, 15; Harrison v. Pepper, 166 Mass. 288, 44 N. E. 222, 33 L. R. A. 239, 55 Am. St. Rep. 404; 11 Harvard Law Review 512. A month to month tenancy terminable upon notice gives rise to an insurable interest. Schaeffer v. Anchor Mut. Fire Ins. Co., 113 Iowa, 652, 85 N. W. 985. In the case of Berry v. American Cent. Ins. Co., 132 N. Y. 49, 30 N. E. 254, 28 Am. St. Rep. 548, it was held that an agreement that a tenant should remain in possession for life provided he paid taxes, insurance, and costs of repairs, created an insurable interest despite the fact that the agreement was not enforceable against the landlord because not in writing.

It is, however, necessary that the insured have a present and real interest in the property to which the peril insured against would cause pecuniary damage. Moving Picture Co. v. Scottish Union Ins. Co., 244 Pa. 358, 90 A. 642; In re Reynolds' Estate, 94 Vt. 149, 109 A. 60; sections 2550 and 2551 of the

California Civil Code. In this case plaintiff had an extensive and real financial interest in the continuance of the lease. He was paying $3 a month for a site for a beautiful dwelling in which he had a cash investment of approximately $31,000. This right, though subject to termination by the owners of the land and difficult to fix the value of, was terminated by fire, the peril insured against. The fact that it was difficult to estimate the value of the right gave rise to the execution of a valued policy instead of an ordinary leasehold policy. The company thereby consented to a fixed valuation of the right. I find that plaintiff had a leasehold interest in the land and an insurable interest in the lease.

No other point raised in the argument merits discussion.

Plaintiff is entitled to recover the full amount of the policy with interest from July 12, 1932, as prayed, and costs of suit. Let judgment be entered accordingly.

I adopt the statement of my views in this opinion as my findings of fact and conclusions of law. As to any matters not specifically covered in the opinion, I find generally in favor of plaintiff.