Eugene P. LEE and Delores Lee, Plaintiffs, Appellees and Cross-Appellants,

v.

NORTH DAKOTA PARK SERVICE, an agency of the State of North Dakota, Defendant, Appellant and Cross-Appellee,

and

Garrison Park District, a Municipal Governmental Corporation of Garrison, McLean County, North Dakota, Defendant and Appellee.

Civ. No. 9336.

Supreme Court of North Dakota.

Dec. 22, 1977.

Rehearing Denied Jan. 11, 1978.

John E. Adams, Asst. Atty. Gen., Bismarck, for defendant, appellant and cross-appellee.

Waldron, Kenner & Halvorson, Minot, for plaintiffs, appellees and cross-appellants; argued by Harris P. Kenner, Minot.

SAND, Justice.

The North Dakota [State] Park Service (hereinafter Park Service) appealed from an adverse judgment issued by the District Court of McLean County awarding $9,310.00 as damages to Eugene P. Lee and Delores Lee (hereinafter Lee) for inverse condemnation resulting from the removal of a roadway in the park. Lee cross-appealed.

A brief historical background will be helpful in the resolution of the basic issue involved.

The United States acquired a fee simple title to the land involved in 1948 through condemnation proceedings in connection with the Garrison Dam and the reservoir project.

Under the authority of the Flood Control Act, 16 U.S.C. § 460d, the United States, through the Department of the Army, on 19 November 1957, granted a "license" to the Garrison Park District to use and occupy for public park and recreational purposes an area consisting of approximately 438 acres, also known as the Fort Stevenson Recreation Area, for the period commencing 1 January 1958 and ending 31 December 1982. Two supplemental agreements entered into 20 June 1966, and 14 June 1974, inter alia, substituted some conditions and withdrew 349 acres from the basic "license" area.

The Garrison Park District on 1 April 1958 executed a ten-year "lease" to Eugene P. Lee of Site B of the Fort Stevenson Recreation Area (located within the area covered by the "license" to Garrison Park District) ending April 1969 for three and one-third percent of the profits. The "lease" contained a provision that it may be renegotiated at the end of three years, and on 1 April 1964 the "lease" was renegotiated for another ten-year period ending 1 April 1974. A further negotiation extended the "lease" to 31 December 1982, to make it consistent with the Garrison Park District "license" from the Department of the Army.

The "lease" executed by the Garrison Park District was submitted to the Department of the Army for prior approval as required by the "license" granted to the Garrison Park District, and was approved.

The Department of the Army in its written approval of the "lease" to Lee considered and designated it a "third-party concession lease" between Garrison Park District and Lee, and approved it with the understanding that the provisions of the "license" to Garrison Park District and amendments thereto were incorporated in and were a part thereof.

Lee developed a resort compound of modern cabins, trophy room complex consisting of a two-bedroom house, kitchen, store, concession area, and meeting and dining room.

The Department of the Army, on 14 June 1974, granted a *lease* to the North Dakota State Park Service for a period of 25 years beginning 1 January 1974 and ending 31 December 1998 to use and occupy for public parks and recreational purposes approximately 349 acres of land and water areas in the Lake Sakakawea Project Area, also known as the Fort Stevenson State Park Area. The instrument is entitled "lease" but from its content appears to be in the nature of a license.

The North Dakota Park Service initiated a policy of limited access to the Fort Stevenson State Park and in furtherance thereof, on or about 1 October 1974, eliminated approximately 700 feet of roadway leading from the Fort Stevenson State Park Area to Lee's Resort. As a result of the removal of this road, public access by car to Lee's Resort was available only via an access road branching off from the old Garrison section road. This increased the driving distance from the camping area to Lee's Resort from 700 feet to about 2½ miles. Previously, access to the Resort was also via the 700-foot road which was obliterated. Lee objected to the removal of the road.

After an unsuccessful attempt to negotiate a settlement, Lee brought an action against the North Dakota Park Service and the Garrison Park District, which resulted in a judgment against the North Dakota Park Service in the amount of $9,310.00, and a dismissal of the complaint against Garrison Park District. The North Dakota Park Service appealed from this judgment and Lee cross-appealed, claiming the damages were inadequate, but Lee did not contest the dismissal of the complaint against Garrison Park District.

The basic question and overriding issue is whether or not the obliteration of the road gives rise to inverse condemnation or any other basis for relief under § 14 of the North Dakota Constitution.

To resolve this basic issue we must determine what rights Lee acquired through the "lease" from the Garrison Park District. This, in turn, requires us first to determine what rights Garrison Park District acquired or had as a result of the "license" granted by the Department of the Army.

The initial "license" to Garrison Park District, dated 3 December 1957, was granted subject to a number of provisions and conditions, including:

"6. That the licensee, in exercising its Governmental or proprietary functions, may operate facilities and accommodations and provide services needed by the public directly, and may enter into concession agreements with third parties for providing needed services to the public, provided that any such agreements have the prior approval of the said District Engineer, and provided further, that any profits obtained by the licensee from any such agreements or from operations by the licensee on the said Government property shall be utilized by the licensee in the further development of the area and that any profits not so utilized shall be paid to the said District Engineer at the expiration of each five-year period of this license. The licensee and its concessionaires may make reasonable charges for such services and for the use of such facilities and accommodations, provided that such charges shall have the prior written approval of the said District Engineer.

"13. That this license may be relinquished by the licensee at any time by giving to the Secretary of the Army, through the said District Engineer, at least thirty (30) days notice in writing.

"14. That this license may be revoked by the Secretary of the Army in the event the licensee violates any of the terms and conditions of this license and continues and persists therein for a period of thirty (30) days after notice thereof in writing by the said District Engineer."

On 12 May 1966, by the adoption of supplemental agreement No. 1, paragraphs 6, 7 and 10 were deleted, and other conditions were substituted in place thereof.

Paragraph 6 was replaced by the following:

"Condition No. 18. The lessee [1] [licensee] shall provide the facilities and services necessary to meet the public demand for the use of the area for public park and recreational purposes either direct or through concession agreements with third parties. All concession agreements shall expressly state that they are granted subject to all of the terms and conditions of this lease [1] and that the concession agreement will not be effective until the terms and conditions thereof are approved by the District Engineer." [Footnote added.]

A review of the statutes, case law, various authorities, and texts, will be helpful in distinguishing the major differences between a "lease" and a "license."

A definition of "leasing" as found in § 47–16–01, North Dakota Century Code is as follows:

"Leasing is a contract by which one gives to another the temporary possession and use of real property for reward and the latter agrees to return such possession to the former at a future time."

Section 47–16–08, NDCC, provides:

"An agreement to lease real property binds the lessor to secure to the lessee the quiet possession of such property during the term of the lease against all persons lawfully claiming the same."

Black's Law Dictionary (4th ed.) defines "lease" as

"Any agreement which gives rise to relationship of landlord and tenant. . .

"Contract for exclusive possession of lands or tenements for determinate period. . . . Contract for possession and profits of lands and tenements either for life, or for certain period of time, or during the pleasure of the parties."

The same authority defines a real property "license" as

"Permission or authority to do particular act or series of acts on land of another without possessing any estate or interest therein."

A license is merely a permit or privilege to do what otherwise would be unlawful; whereas a lease gives the lessee a right of possession of the property leased and the exclusive use or occupation of it for all purposes not prohibited by the terms. *American Coin-Meter of Colorado Springs, Inc. v. Poole*, 31 Colo.App. 316, 503 P.2d 626, 627 (1972).

A government permit to use lands on National Forest Reserve for mining barium is only a license and not a lease. *Saxman v. Christmann*, 52. Ariz. 149, 79 P.2d 520 (1938).

In *DiRenzo v. Cavalier*, 165 Ohio St. 386, 135 N.E.2d 394, 396 (1956), the Court quoted with approval from 32 Am.Jur., *Landlord and Tenant*, § 5, page 31:

"A license to do an act upon land involves the exclusive occupation of the land by the licensee, so far as is necessary to do the act, and no further, whereas a lease gives the right of possession of the land, and the exclusive occupation of it for all purposes not prohibited by its terms.

"Whether an instrument is a license or a lease depends generally on the manifest intent of the parties gleaned from a consideration of its entire contents."

In *Miller v. City of New York*, 15 N.Y.2d 34, 255 N.Y.S.2d 78, 80, 203 N.E.2d 478, 480 (1964), the Court said:

"The difference between a license and a lease is plain enough although in borderline cases sometimes difficult to apply.

. . .

". . . A document calling itself a 'license' is still a lease if it grants not merely a revocable right to be exercised over the grantor's land without possessing any interest therein but the exclusive right to use and occupy that land."

The question in this case involved whether or not the instrument was a license or a lease, where the City only had authority to

1. This is the first time the terms "lessee" and "lease" were used in the license and from the context this appears to be an error.

issue licenses and not leases. The Court said:

"But even if there were a doubt about it in a case like this, it would be our duty to deny the existence of the power." *Miller, supra,* at 80, 203 N.E.2d at 480.

In *Lehman v. Williamson,* 35 Colo.App. 372, 533 P.2d 63, 65 (1975), the Court said:

"There is a clear distinction in the legal interest conveyed by a license and an easement. An easement, while distinct from ownership of land itself, is an interest in land. [Citation omitted.] A license is, however, merely a personal privilege to do some particular act or series of acts on land without possessing any estate or interest therein. [Citations omitted.] Also, a license is, ordinarily, revocable at the will of the licensor and is not assignable."

The distinction between "licenses" and "leases" as judicially determined are set out in Words and Phrases, Vol. 25, and include the following judicial statements:

" 'License,' unlike 'lease,' conveys no estate in affected property, and is generally revocable at will without notice. *Strandholm v. Barbey,* 145 Or. 427, 26 P.2d 46."

"Essential of 'lease,' as distinguished from 'license,' is that it gives the right of possession of real property as against even landlord. *Smith v. Royal Ins. Co.,* D.C.Cal., 5 F.Supp. 435, 437."

"While 'license' is merely right to do certain things upon property of another, 'lease' confers exclusive possession to lessee in exchange for payment of rentals. *In re Owl Drug Co.,* 12 F.Supp. 439, 442, 444 (D.C.Nev.)."

"The difference between a license and a lease is that the lease gives to the tenant the right of possession against the world, while a license creates no interest in the land, but is simply the authority or power to use it in some specific way. *Joplin Supply Co. v. West,* 149 Mo.App. 78, 130 S.W. 156, 161."

Case law also defines "license" generally:

"A 'license' is a permission granted by some competent authority to do some act which, without such permission, would be illegal. *State ex rel. Zugravu v. O'Brien,* 130 Ohio St. 23, 196 N.E. 664."

"A 'license' is an authority or permission to do particular act or series of acts upon the land in possession of another. *Resnick v. City of Fort Madison,* 259 Iowa 578, 145 N.W.2d 11, 14 . . . [and] without possessing any estate therein. *Bryant v. Marstelle,* 76 Cal.App.2d 740, 173 P.2d 846, 849."

Case law, as found in Words and Phrases Vol. 24A, also defines a "lease" as an agreement whereby the relationship of landlord is created:

"Lease is contract for exclusive possession of lands, tenements or hereditaments for life, for term of years, or at will, or for any interest less than that of lessor, usually for a specified rent or compensation. *Urban Investment & Development Co. v. Maurice L. Rothschild & Co.,* 25 Ill.App.3d 546, 323 N.E.2d 588."

"Lease is grant of exclusive possession to use land for any lawful purpose, subject to the reservation of right of possession in landlord for any purpose or purposes not inconsistent with the privileges granted tenant. *Town of Kearny v. Municipal Sanitary Landfill Authority,* 143 N.J.Super. 449, 363 A.2d 390."

In 51C C.J.S. *Landlord & Tenant* § 202(6), p. 524, we find the following statement relating to leases and licenses:

"It is often difficult to determine whether a particular contract or agreement is a lease or a license. Whether a particular agreement is a lease or a license depends on whether or not it shows the intention to establish the relation of landlord and tenant, such intention being determined from a consideration of the entire incident, and the circumstances under which it was made. If the contract confers exclusive possession of the premises or a portion thereof as against the whole world, including the owner, it is a lease, while if it merely confers a privilege to use or occupy under the owner it is a license. It has otherwise been stated that a lease differs from a

license in that a lease of land conveys an interest in the land, requires a writing to comply with the statute of frauds, and transfers possession, while a license merely excuses acts done by one on land in the possession of another that without a license would be trespasses, and conveys no interest in land. Definiteness of the space to be occupied is one of the criteria for determining whether the instrument is a lease. Further, a lease is a corporeal, and a license an incorporeal, hereditament. If the contract is for the exclusive possession and profits of the land, it is a lease, and not a license, no matter in what medium the rent is to be paid. Absence of consideration is more indicative of a license than a lease. A mere permission to occupy the land of another for any purpose is a license, and not a lease. Ordinarily, the question of the construction to be given the instrument is a question of law, but it has also been held that the question whether a building was occupied under a license or lease is one for the jury. The term applied by the parties does not necessarily determine whether a document is a lease or license, although it may sometimes be given effect; and even though a contract purports to be a license, if it is strictly within the definition of a lease it will be construed as such, and where an agreement in fact creates a license to go on realty for a particular purpose, it may not be construed as a lease notwithstanding it is called a lease by the parties. Leases and licenses are not so antagonistic that they cannot both be declared to exist within one agreement." [Underscoring ours.] See also, 49 Am.Jur.2d *Landlord and Tenant* § 5, p. 45; and Vol. 3, Thompson on Real Property (1959 Replacement) § 1032, p. 104.

The license granted to the Garrison Park District by the Secretary of the Army was under the provisions of 16 U.S.C. § 460d, which authorizes the Chief of Engineers under the supervision of the Secretary of the Army to permit the construction of recreational facilities by local interests and permits the maintenance and operation of the recreational facilities by the local interests.

Title 16 U.S.C. § 460d provides that preference shall be given to federal, state, or local governmental agencies and licenses or leases where appropriate may be granted without monetary consideration to such agencies for the use of all or any portion of the project area for any public purpose when the Secretary of the Army determines such action to be in the *public interest* and for such conditions as he may find advisable. It further provides that all moneys received by the United States for leases or privileges shall be deposited in the treasury of the United States as miscellaneous receipts.

We also note that 16 U.S.C. § 460d throughout refers to leases, licenses, or privileges. We must assume that the Secretary of the Army was fully familiar with the provisions of 16 U.S.C. § 460d, and in the transactions with the Garrison Park District deliberately chose the license rather than the lease method. We must further assume that the Secretary of the Army was fully cognizant of the differences between "licenses," "privileges," and "leases." We further note that the instrument was entitled "license" and throughout the instrument the term "license" was employed. For example, "the license is granted subject to the following provisions and conditions: (1) that the licensee . . . shall conform to such rules . . . (3) that the licensee may construct . . ." etc. Throughout the entire instrument the term "licensee" is used rather than the term "lessee." We specifically note that on Condition 6 it is provided that the "licensee . . . may enter into *concession agreements with third parties*" for providing needed services to the public, and that both in supplemental agreements Nos. 1 and 2 reference is made to the Garrison Park District as the "licensee." Only in paragraph 18, replacement Condition No. 6, were the terms "lessee" and "lease" used.

■ After reviewing and examining statutes, case law, authorities, and texts, it

appears the major differences between a "lease" and a "license" are that a lease confers exclusive possession against the world and owner, unless otherwise provided, grants exclusive possession and profits, grants a corporeal hereditament or an estate in the land; whereas a license merely grants permission to use the land under certain conditions and restrictions.

■ In applying the foregoing principles of law to the instrument executed by the Secretary of the Army entitled "License" and dated 19 November 1957, we find it does not convey an interest or estate in the land, it does not confer exclusive possession of the land, and it does not grant exclusive use of the profits obtained from operating the recreation area, but instead limits the use to very restricted conditions, and permits the licensee to relinquish the license by giving thirty days' notice in writing. It also permits the license to be revoked by the Secretary of the Army in the event the licensee violates any terms or conditions of the license and persists therein for a period of thirty days after notice in writing to the District Engineer.

We must therefore conclude that the instrument dated 19 November 1957 entitled "License" (granted by the Secretary of the Army to the Garrison Park District) is in fact and as a matter of law a license and not a lease.

■ In *Tidwell v. State ex rel. Herman,* 21 Ariz.App. 3, 514 P.2d 1260 (1973), the State instituted eminent domain proceedings to condemn a right of way for highway purposes across certain patented land. The husband and wife, the owners of a grazing permit, contended that the construction of the highway through the grazing land which was fenced in deprived them of the full use of the grazing permit they received from the United States Government. The court, in denying damages, said that the permit from the federal government was a mere license and gave them no estate or property right in the land. 98 C.J.S. Woods and Forests § 11g; *Acton v. United States,* 401 F.2d 896 (9th Cir. 1968), *cert. den.* 393 U.S. 1121, 89 S.Ct. 1003, 22 L.Ed.2d

128 (1969). The license, being a mere permissive use, is not property in a constitutional sense. *State v. 0.622 Acres of Land, More or Less,* 254 A.2d 57 (Del.Super.1969); *Board of County Commissioners of Dona Ana County v. Sykes,* 74 N.M. 435, 394 P.2d 278 (1964).

In *Acton, supra,* the Court had under consideration the rights of individuals holding revocable uranium prospecting permits from the United States Government. In attempting to develop adequate sources of uranium materials, the United States Congress enacted 42 U.S.C. § 2011 et seq., and in doing so recognized that private funds and initiative would be required for such development and authorized a public appeal to individuals to prospect and develop uranium ore bodies on public lands of the United States. The Department of the Army commenced condemnation proceedings. The holders of the revocable uranium prospecting permits claimed compensation for the cancellation of the permits.

In denying the claim of the permit holders, the Court said:

"It is fundamental that when the United States takes private property for public use the Fifth Amendment requires payment of just compensation. This obligation, however, recognizes only vested property rights, and not the tenuous rights of licenses and permits, even though these at times may have value.

"There have been cases in which certain unique interests have been recognized a private property and thus compensable within the meaning of the Fifth Amendment. Unfortunately, appellant's situation does not fall reasonably within any of these circumstances." *Acton, supra,* at 899.

The Court further stated:

"It is clear that a license does not constitute property for which the Government is liable upon condemnation, and passes to the licensee no estate or interest in the lands." *Acton, supra,* at 899.

The Court, in *Acton, supra,* recognized and took into consideration the fact that

the permit holder expended substantial time and funds in the development of the claims, particularly for building roads, for geological surveys, and for equipment needed in the preparation of the claims and to further actual mining operations. But nevertheless the Court concluded that the permit holder was not entitled to compensation for the taking of private property under the Fifth Amendment. The Court also stated that the permit holders overlooked the fact that they held only licenses, which, as previously noted, do not fall within the meaning of private property under the Fifth Amendment, and cited in support thereof *United States ex rel. T.V.A. v. Powelson,* 319 U.S. 266, 281, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943).

We conclude from the foregoing that a license without any other agreement[2] is not private property in the constitutional sense so as to bring it within the Fifth Amendment prohibiting its taking for public use without just compensation. Neither does it constitute private property under § 14 of the North Dakota Constitution.

We now consider the instrument executed by the Garrison Park District, the licensee, dated 1 April 1958, entitled "Lease" purporting to lease Site B of the Fort Stevenson Recreation Area to Eugene P. Lee for a period of ten years, and later extended for another ten-year period, to determine if it created any rights equivalent to private property which may not be taken without just compensation pursuant to § 14 of the North Dakota Constitution.

The agreement between Garrison Park District and Lee is entitled "Lease"[3] and the terms "lessor" and "lessee" are used, but the contents of the instrument clearly show that it was a concession agreement which is in effect a license. The title of an instrument is not controlling. Fur-

thermore, in accordance with the license from the United States Government, the Garrison Park District had authority only to enter into concession agreement with third parties, subject to approval of the United States Government. In approving the instrument [license] between the Garrison Park District and Lee, the United States Government designated it a "Concession Agreement." Had the instrument been truly a lease in the accepted sense, it is doubtful that the United States Government would have given its approval, especially where the government merely gave a license to Garrison Park District. This, of course, raises the obvious question: May the licensee convey or transfer an interest greater than what he had in the first place?

In *Interstate Hosts, Inc. v. Airport Concessions, Inc.,* 71 Wash.2d 487, 429 P.2d 245, 247 (1967), the Court had under consideration a lease and a sublease, and what rights the sublessee acquired through the sublease. The Court stated:

"... it is clear that they [rights] could be no broader than those granted to the sublessor in the basic lease."

This principle applies to the instant case. Lee could not have obtained any greater rights than those given to Garrison Park District in the license even though the instrument between Garrison Park District and Lee was designated a "lease."

The Court, in *Kavanaugh v. Cohoes Power & Light Corp.,* 114 Misc. 590, 187 N.Y.S. 216, 228 (1921), said that technically and in its proper significance, the term "lease" refers to a transfer of a less interest than the lessor has, for if it is of the whole interest it is more properly as assignment than a lease.

Garrison Park District had no authority to assign its license and the so-called "lease" did not purport to do so. Garrison

---

2. *Cf. McGuire v. United States,* 158 Ct.Cl. 285, 305 F.2d 449 (1962), where the Government agreed to pay concessionaire book value for his property if the Government discontinued agreement before ten-year period. Concessionaire quit on his own, alleging hunting was curtailed by Government, but Court allowed no damages.

3. The Iowa Supreme Court in *Denecke v. Miller & Son,* 142 Iowa 486, 119 N.W. 380, 384 (1909), said: "... courts will look beyond the form of the transaction to discover its true import." To this we add that substance rather than label prevails.

Park District only had authority to enter into "Concession Agreements" with third parties.

What is a concession agreement?

In *City of Detroit v. Tygard,* 381 Mich. 271, 161 N.W.2d 1, 3 (1968), the following dictionary definition of "concession" was adopted:

"A privilege or space granted or leased for a particular use within specified premises."

Black's Law Dictionary (4th ed.) defines "concession" as:

"A grant; ordinarily applied to the grant of specific privileges by a government."

In *Henson v. Airways Service, Inc.,* 220 Ga. 44, 136 S.E.2d 747, 751 (1964), the Court had under consideration an instrument entitled "Lease and Concession Agreement." The Court then said:

"The word 'concession' means 'a grant by a government of land, or property, or of a right to use land or property for some specified purpose.'"

The Court held that under this instrument the Airways company did not receive from the city an estate in the premises or a usufruct but obtained only a license to use the premises for certain purposes under the control of the city and that the right under the lease and concession agreement was not taxable on an ad valorem basis.

In *Collier v. Akins,* 102 Ga.App. 274, 116 S.E.2d 121 (1960), the Court held that an agreement by which the Department of State Parks turned over described realty consisting of locations for picnicking, camping, and hosteling to an individual who agreed to operate the premises for the convenience of the public must be construed as a valid park concession under the Georgia laws, even though the agreement was designated a lease and the parties thereto were denominated lessor and lessee. See also, *Warren v. City of Topeka,* 125 Kan. 524, 265 P. 78 (1928).

Relying on the foregoing principles of law, we conclude that Lee had only a concession agreement, and not a lease as that term is understood in its legal sense. Under the concession agreement Lee did not acquire a greater interest or right than the Garrison Park District held or had under its license.

We must also take into consideration that the authority given to the Chief of Engineers in 16 U.S.C. § 460d, under which the license to Garrison Park District was granted, was predicated upon a determination made by the Secretary of the Army that it would be in the public interest.

In *Cubellis v. Costar,* 65 F.R.D. 49, 51 (W.D.Pa.1974), Cubellis initiated an action against Costar and the Secretary of the Army of the United States and the District Engineer for the Corps of Engineers seeking preliminary and permanent injunction against an alleged eviction of his trailer from the marina park in Clark, Pennsylvania. The land belonged to the United States Government, which leased it to the Costars, who in turn sublet part of it to Cubellis to keep a trailer on it. The lease expired 15 November 1973, but he obtained an oral lease to remain in possession until 1 May 1974. Cubellis specifically claimed that any eviction without providing a good reason constituted a violation of the Fifth and Fourteenth Amendments relating to Due Process and was in violation of 16 U.S.C. § 460d and the Civil Rights Act because the land basically was owned by the United States for recreation purposes of the public as a whole and as such created an occupant's right similar to that recognized in low-cost housing projects.

The Court, in dismissing the action, said:

"The lease from the Federal Government to the Costars provides that "The lessee understands that the primary objective of the Government in granting this land is to obtain services and facilities adequate to meet the public demand at reasonable charges to the public. Further, 16 U.S.C. § 460d, which authorizes such leases, states that they are to be granted 'for such purpose as he (the Secretary of the Army) may deem reasonable in the public interest . . . .' It is not apparent to me how the public inter-

est can be fulfilled in a recreation area allowing those who apply first for a property lease for a specified term to maintain a judicially enforceable interest in such property perpetually or for as long as they desire. To approve such a situation would in reality be to permit public land to be subjected to a monopoly. 'First-come, first-served' does not fit the public interest in this particular case." Cubellis, supra, at 51, 52. [Underscoring ours.].

The basic license to Garrison Park District was pursuant to 16 U.S.C. § 460d and the public interest provision of the statute also applies to this case.

Most of Lee's legal arguments relied upon situations where property owners' access was severely impaired or removed, such as those found in *Guerard v. State,* 220 N.W.2d 525 (N.D.1974), and its predecessors. The principles of law announced and relied upon in those cases do not apply here for the reason that Lee only had a concession agreement, the equivalent of a license, and as such did not qualify as an owner or a person having a leasehold interest or estate in the property.

In cases involving owners abutting the highway, even where the access has been made more circuitous or has been impaired or removed as a result of relocation, grade change, or fencing of the highway, the courts have held that the property owners are not always entitled to compensation if the injury is the same in kind and not in excess of that suffered by the general public. See *Guerard, supra.*

In *Guerard, supra,* at 529, this Court also said:

"Diversion of public traffic does not create a right to compensation. *Jamestown Plumbing & Heating Co. v. City of Jamestown,* 164 N.W.2d 355 (N.D.1969). Other cases are collected at 26 Am.Jur.2d Eminent Domain, Section 205."

In *Warren v. Iowa State Highway Commission,* 250 Iowa 473, 93 N.W.2d 60, 67, 68 (1958), the Iowa Supreme Court, after reviewing a number of its earlier decisions, said:

"The principle evolving from the foregoing authorities is that one whose property abuts upon a roadway, a part of which is closed or vacated has no special damage if his lands do not abut upon the closed or vacated portion so that his right of ingress and egress is not affected. If he has the same access to the general highway system as before, his injury is the same in kind as that suffered by the general public and is not compensable. It is damnum absque injuria. In the case before us, the plaintiff's right of access to the secondary road is not affected. She has the same means of ingress and egress that she had prior to the closing. The traveling public generally who have occasion to use the secondary road will find it much less convenient on many occasions. Some persons living along the roadway, or those who may wish to visit their lands lying along it, will be compelled to travel additional miles. Some will be shut off from their formerly direct route to the nearest city or town. They will be considerably inconvenienced in visiting these places for shopping purposes, or in taking their livestock or grain to market. Persons in the city or town desiring to visit farms along the road for business or social purposes must go farther and on other roads to reach their destination which may lie on the other side of U.S. Highway No. 35. But they have no recourse in damages.

"This is a common injury, inevitable in the building of highways, or in handling the traffic upon them. Many owners of motels, or gasoline stations, or other business establishments find themselves left in a bywater of commerce when the route of a highway is changed so that the main flow of traffic is diverted. A merchant or other business man is cut off from prospective customers going in one direction when a street in front of his establishment is converted into a one-way thoroughfare. A divided highway, or one with jiggle bars or other obstructions in the center to prevent traffic crossing, has the same effect. But this gives the

business man no claim for damages against authority which has installed the traffic regulators which injure him. *Iowa State Highway Commission v. Smith, supra*; *Wilson v. Iowa State Highway Commission,* 249 Iowa 994, 90 N.W.2d 161, 168.

"It is apparent that the plaintiff will suffer considerable inconvenience in being shut off from her previous direct access to her lands lying west of the point of closing of the secondary road with its intersection with Highway No. 35. [The Court noted that the change required her to go a circuitous route of over three miles from the home place to the other tract instead of the prior direct one-quarter mile route over the secondary road.] . . . Her damage is greater in degree than that suffered by the general public; but is not different in kind, which is the ultimate test. The greatest good of the greatest number is the criterion which the authorities having charge of the building, alteration, and maintenance of the highway systems in the state must follow. In the absence of any showing of fraud or bad faith, their judgment is final. It cannot be reviewed by the courts. . . .

"We conclude that the Iowa State Highway Commission was given the definite power . . . to close the secondary road . . . and that the plaintiff will suffer no compensable damage therefrom, and is not entitled to maintain this action." *Warren, supra,* at 67, 68.

In *Larsen v. State,* 238 N.W.2d 684, 687 (S.D.1976), the Court said:

"It is true that if a landowner's access to his property has been materially impaired, he has suffered compensable damage, 'if the consequential injury is peculiar to the owner's land and not of a kind suffered by the public as a whole.' *Hurley v. State,* 1966, 82 S.D. 156, 143 N.W.2d 722." [Underscoring ours.]

In *Bopp v. State,* 19 N.Y.2d 368, 280 N.Y.S.2d 135, 227 N.E.2d 37 (1967), the Court of Appeals of New York held that damages resulting from the circuity of ac-

cess to condemnee's property because of relocation of a highway as well as damages incurred because traffic no longer passed his property were not compensable. The court also concluded that where the state has determined it would be in the public interest to construct a new and modern highway capable of providing safer and speedier travel than the old route, the complainants may not complain. It said that the state has fulfilled its obligation if it has reasonably given adequate means of access to and from the new highway.

In *Brock v. State Highway Commission,* 195 Kan. 361, 404 P.2d 934 (1954), the court had under consideration an action for damages resulting from the alleged deprivation of the communal right to direct access to a pre-existing highway. The court held that abutting property owners [as distinguished from licensees] whose land had bounded on the highway before condemnation of property for purposes of widening the highway, were not entitled to damages where they had access to the through-traffic lanes of the highway by points of connection only 575 feet apart.

The court specifically held that circuity of travel necessarily and newly created to and from real property does not of itself result in legal impairment of the right of ingress and egress to and from such property on a controlled access highway.

There are, however, cases cited in the Annotation found at 43 A.L.R.2d 1061–1067, and in the A.L.R.2d Later Case Service supplementing A.L.R.2d allowing compensation for circuity of travel and impairment of ingress and egress, but almost all of these cases involve a property owner, or its equivalent, and do not involve a licensee or a concessionaire, or persons of similar standing.

There is an additional matter to be considered regarding the obliteration of the road, the focal point of this case. The road was not obliterated against the wishes or consent of the United States Government or its agency.

The United States Government and its agencies never surrendered certain preroga-

tives pertaining to the area in question, including but not limited to making improvements or changes as the situation might demand. The road which was obliterated consisted of a trailway at the time Lee opened his resort under the initial agreement with the Garrison Park District. Later the United States Government, through its agencies, improved the road by blacktopping it. The right to permit the road to be altered or obliterated always remained with the United States Government.

The ultimate obliteration of the road came about as an item included in the master plan which was approved or ratified by the United States Government, which had the authority to refuse permission to obliterate the road. The obliteration was accomplished by the State Park Service, but in reality it was the United States Government through the State Park Service which did so.

The initial license to the Garrison Park District provided that the licensee shall hold the United States harmless from any and all such claims referring to "other governmental activities on said premises." This provision was made a part of the agreement between Garrison Park District and Lee. Lee, therefore, is bound to accept this condition. The obliteration of the road was a governmental activity. The action against the State Park Service is not compatible with this provision. The provision to hold the United States harmless is in accord with the concept of a license, which is what was initially issued by the United States Government through its agencies to the Garrison Park District, from whom Lee obtained the concession agreement. Lee could not legally have acquired a greater right than the Garrison Park District had under the license from the United States Government. Any possible claim Lee may have had against Garrison Park District was not pursued in this appeal.

By applying the foregoing principles of law as stated in the opinion, it necessarily follows and we conclude that any right Lee acquired by and through the concession agreement did not qualify as, nor was it comparable to, private property, as that term is used in § 14 of the North Dakota Constitution and the Fifth Amendment to the United States Constitution requiring just compensation for its taking.

Accordingly, the judgment of the trial court is reversed and the case is remanded for entering a judgment of dismissal.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VOGEL, JJ., concur.