# IN THE SUPREME COURT
# STATE OF NORTH DAKOTA

## 2019 ND 296

Skaw ND Precast, LLC,                                                    Plaintiff and Appellee

   v.

Oil Capital Ready Mix, LLC, Agape
Holdings, LLP, Scott Dyk and Samuel Dyk,            Defendants and Appellants

## No. 20190138

Appeal from the District Court of Williams County, Northwest Judicial District, the Honorable Paul W. Jacobson, Judge.

AFFIRMED.

Opinion of the Court by VandeWalle, Chief Justice.

David A. Tschider, Bismarck, ND, for plaintiff and appellee.

Mark A. Schwab, West Fargo, ND, for defendants and appellants.

**VandeWalle, Chief Justice.**

[¶1]   Oil Capital Ready Mix, LLC; Agape Holdings, LLP; Scott Dyk; and Samuel Dyk (collectively "Dyk") appealed from a judgment awarding Skaw ND Precast LLC ("Skaw") $69,295 in damages for conversion of its property. Because the district court's findings of fact are not clearly erroneous, we affirm the judgment.

I

[¶2]   In March 2013, Skaw, a company which manufactures and sells precast concrete items, entered into a five-year agreement with Tioga Ready Mix ("Tioga"), a company which produces ready-mix concrete product, to rent a two-acre parcel of land to conduct its business.  The base rent for the site was $700 per month, subject to reductions if Skaw purchased designated quantities of ready-mix product from Tioga.  The agreement provided it would remain in effect until December 31, 2018, and it did not allow either party to unilaterally cancel the agreement.

[¶3]   In spring 2015, Skaw learned that Tioga had arranged to sell Tioga's assets at a public auction, including the two-acre parcel of property where Skaw conducted its business.  Skaw's owners attended the auction sale in May 2015.  The auction service notified all attendees that Skaw's assets on the premises were not part of the sale, that there was a lease in place between Skaw and Tioga, and that the lease went with the land.  Dyk was the successful bidder at the auction and entered into a commercial purchase agreement with the sellers which did not include Skaw's product inventory or equipment and stated the sale was subject to "rights of tenants," but did not list Skaw as a tenant.  Once Dyk got its ready-mix plant running, Skaw began purchasing concrete ready-mix product from Dyk for its business.

[¶4]   In August 2015, Dyk requested and was provided a copy of the March 2013 agreement between Skaw and Tioga.  Dyk's attorney informed one of Skaw's owners that the agreement between Skaw and Tioga "is no longer

capable of being performed" and that "we need to come to terms." Dyk attempted to renegotiate the terms of the 2013 agreement, and Skaw agreed to increase its monthly rental payments to $750 per month.

[¶5]   On September 23, 2015, Dyk mailed a "notice of non-renewal of lease" to Skaw stating:

> PLEASE TAKE NOTICE that the lease under which you hold possession of the above described property will terminate pursuant to its own terms on November 22, 2015 and will not be renewed for a new term, nor allowed to be converted to a month-to-month tenancy.  Please do not tender any money that will pay rent beyond the end of the term.  Please further be advised that any money tendered, if accepted will have been accepted in error and will be returned.
>
> PLEASE TAKE FURTHER NOTICE that you are required to surrender the premises to Samuel Dyk upon the termination date. Please return the premises in the same condition as you found it upon move-in, normal wear and tear excepted.  Furthermore, you are required to return all keys upon vacating the premises. Failure to vacate the premises on or before the termination date will result in legal proceedings against you to recover possession of said premises.

During late 2015, both Skaw and Dyk shut down operations for the winter off-season.  Skaw did not comply with Dyk's "notice."

[¶6]   During the winter, Dyk built an earthen berm around Skaw's equipment which prevented Skaw from accessing it.  Dyk also transported Skaw's concrete pad and block inventory off of Skaw's two acres to an area adjacent to Dyk's offices.  Other Skaw assets were transported to undisclosed locations.  When Skaw discovered the berm had been constructed and its assets had been moved, Dyk informed Skaw that Skaw had abandoned their temporary rental agreement in December 2015 and that law enforcement would be notified if there were "any attempts to breach the peace or trespass" on the property. Skaw replied that the 2013 lease was still valid and had not been abandoned, and that Skaw planned to return to the property and continue operations.  Dyk

2

continued to claim the 2013 lease was invalid and would not allow Skaw access to the property.

[¶7] After the parties' actions resulted in exchanges of accusations to law enforcement of trespass and felony theft, they began negotiating for the removal of Skaw's assets from the property. In April 2016, the parties entered into a "right of access agreement" in which Dyk granted Skaw "the right to access the PREMISES for the sole and exclusive purpose of retrieving the items listed on Schedule A, and for no other purpose in exchange for a total payment of" $5,250. The items listed on Schedule A included a number of septic tanks, cylinders, covers and lids, but did not include Skaw's concrete blocks and pads which had been transported from the lease site to Dyk's office area. After retrieving the Schedule A property, Skaw returned to the premises to remove the remaining cement blocks and pads. Skaw discovered that many of the cement blocks and pads were either missing or broken. On the morning of May 19, 2016, Dyk informed Skaw that it would be allowed until 6 p.m. the following day to remove more than 113 concrete blocks and pads from the premises, and if Skaw remained on the property after 6 p.m., Dyk would seek criminal prosecution against Skaw. Because of the physical impossibility of removing the concrete blocks and pads from the property in 36 hours, Skaw did not attempt to retrieve its assets.

[¶8] In December 2016, Skaw brought this conversion action against Dyk. Following a bench trial, the district court held Dyk liable for conversion damages. The court ruled that the 2013 agreement between Skaw and Tioga was a lease which was binding on Dyk until December 31, 2018, and that Dyk was fully aware that the purchase of the property was subject to the lease agreement. The court found that Skaw did not abandon the lease or its property and that Dyk wrongfully converted the property. The court awarded Skaw $52,295 for the value of the wrongfully converted property and $17,000 for time and money expended by Skaw in pursuit of the property, for a total damage award of $62,295.

3

## II

[¶9] Dyk argues the district court erred in ruling the 2013 agreement between Skaw and Tioga was a lease rather than a license.

[¶10] In *Blankenau v. Landess*, 626 N.W.2d 588, 593 (Neb. 2001), the Nebraska Supreme Court summarized well-settled principles of property law:

> Generally, the owner of leased property may sell the property, and such grant conveys the landlord's interest in the lease. 49 Am.Jur.2d *Landlord and Tenant* § 1052 (1995). A sale by the lessor of real estate, during the unexpired leasehold term under which the tenant is holding, does not, of itself, abrogate the lease, determine the leasehold estate, or authorize the landlord or the tenant to treat the lease as at an end. *Kirk Corp. v. First American Title Co.*, 220 Cal.App.3d 785, 270 Cal.Rptr. 24 (1990); *Plastone Plastic Co. v. Whitman-Webb Realty Co.*, 278 Ala. 95, 176 So.2d 27 (1965); 49 Am.Jur.2d *Landlord and Tenant* § 1060 (1995). Its effect is to grant all the rights of the original landlord to the grantee of the reversion. *Id.* The grantee then becomes the landlord by operation of law, and the tenant becomes a tenant of the grantee of the reversion. *Id.* See, also, *Watson v. Calvin*, 69 Ark.App. 109, 9 S.W.3d 571 (2000) (when lessor sells property that is subject to unfulfilled lease, buyer takes property subject to terms of lease); *Murphrey v. Winslow*, 70 N.C.App. 10, 318 S.E.2d 849 (1984), *reversed on other grounds* 313 N.C. 320, 327 S.E.2d 878 (1985) (when title passes, lessee ceases to hold under grantor and becomes tenant of grantee; privity is automatically established between lessor's grantee and lessee).

*See also* 49 Am.Jur.2d *Landlord and Tenant* § 233 (2018); 52 C.J.S. *Landlord and Tenant* § 159 (2012).

[¶11] Section 47-16-01, N.D.C.C., defines "[l]easing" as "a contract by which one gives to another the temporary possession and use of real property for reward and the latter agrees to return such possession to the former at a future time." We have defined a lease as "an agreement under which owner gives up possession and use of property for valuable consideration and for definite term and at end of term owner has absolute right to retake, control, and use

property." *Prairieview Nursing Home v. N.D. Dep't of Human Servs.*, 1999 ND 142, ¶ 9, 598 N.W.2d 116 (quoting Black's Law Dictionary 889 (6th ed. 1990)); *see also Lee v. N.D. Park Serv.*, 262 N.W.2d 467, 471 (N.D. 1977) (noting lease is contract for possession of property for a term of years usually for a specified rent). We have recognized a lease as being equivalent to a sale of the land for the term of the lease in which the lessee acquires an estate in the land. *See Twogood v. Wentz*, 2001 ND 167, ¶ 15, 634 N.W.2d 514. On the other hand, a license is merely a permit or privilege to do what otherwise would be unlawful, *see Lee*, at 470, and merely grants a right or permission to nonexclusive use of the land for a specific, limited purpose. *See Riverwood Commercial Park, LLC v. Standard Oil Co., Inc.*, 2005 ND 118, ¶ 11, 698 N.W.2d 478. A license does not convey an estate in affected property and is generally revocable at will without notice. *See Hector v. Metro Ctrs., Inc.*, 498 N.W.2d 113, 117 (N.D. 1993).

[¶12] Dyk argues the 2013 agreement was a mere license because it granted Skaw the right to use the two-acre plot for six limited purposes, including manufacturing precast concrete products, and imposed other restrictions and obligations on use of the property. However, restrictions on the use of property do not transform a lease into a license. We have said "a lease gives the right of possession of the land, and the exclusive occupation of it for all purposes *not prohibited by its terms*." *Lee*, 262 N.W.2d at 470 (emphasis added; internal citation omitted). The 2013 agreement stated it was effective until December 31, 2018, and contained provisions for monthly rent. Up until the time of the lawsuit, the parties throughout their interactions treated the agreement as a lease. We conclude the court did not err in ruling the 2013 agreement was a lease which Dyk could not cancel at will.

[¶13] Dyk also argues, even if the 2013 agreement was a lease, it was modified by the parties because Skaw agreed to increase rent from $700 to $750 per month. However, there was no evidence that other terms of the lease regarding duration or the amount of property subject to the lease were amended. The rent modification did not relieve Dyk of its obligations under the lease or allow Dyk to eject Skaw from the property. Dyk's argument is without merit.

[¶14] Dyk argues the district court erred in finding he converted Skaw's property.

[¶15] In *Nelson v. Mattson*, 2018 ND 99, ¶ 24, 910 N.W.2d 171, we said:

> Conversion is the "tortious detention or destruction of personal property, or a wrongful exercise of dominion or control over the property inconsistent with or in defiance of the rights of the owner." *Ritter, Laber and Associates, Inc. v. Koch Oil, Inc.*, 2004 ND 117, ¶ 11, 680 N.W.2d 634. We have said that if a party "rightly came into possession and there was no wrongful taking of goods, demand and refusal to return may be required for conversion." *Id.* A trial court's determination on whether a conversion has been committed is a finding of fact subject to the clearly erroneous standard of review. *Paxton v. Wiebe*, 1998 ND 169, ¶ 29, 584 N.W.2d 72.

A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, after reviewing all of the evidence, this Court is convinced a mistake has been made. *See Larson v. Tonneson*, 2019 ND 230, ¶ 10, 933 N.W.2d 84.

[¶16] After Dyk refused to honor the 2013 lease agreement between Skaw and Tioga, Dyk detained Skaw's property and refused to grant Skaw a reasonable opportunity to retrieve its property. The circumstances in this case do not suggest that Skaw voluntarily abandoned its property. As the district court found:

> On May 19, 2016, at 11:15 A.M., Attorney Frisk notified Officer Braaten that . . . Skaw would have until 6:00 p.m. on Friday, May 20, 2016, or 36 hours, to remove all of the remaining Skaw pads and blocks from the property. Attorney Frisk stated as follows: "Beginning at 6:01 p.m. any one on site will be trespassing. A complaint to Ben Johnson will be made on our behalf should anyone decide to test this." Defendants threatened criminal prosecution in the event Skaw entered the Defendant's property after 6:00 o'clock p.m. on Friday, May 20, 2016. As of the date of Frisk's May 19, 201[6] e-mail, the Defendants had not commenced

an eviction action against Plaintiff. Defendants had no legal basis to exclude Plaintiff from the leased site and no legal basis to threaten Plaintiff with a trespass claim. The Plaintiffs testified it was physically impossible to remove that many pads and blocks in 36 hours and did not re-enter the Defendants' property to retrieve any Skaw assets.

. . . .

The Court determines that the Defendants['] acts herein, including the wrongful eviction of Plaintiff from the leased site, constitute the wrongful exercise of dominion and control by Defendants over the personal property of Plaintiff in a manner inconsistent with, or in defiance of, . . . Skaw's rights and constitute the wrongful conversion by Defendants of Skaw's personal property.

[¶17] Dyk argues this case "is analogous, if not identical" to this Court's decision in *Paxton v. Wiebe*, 1998 ND 169, ¶¶ 33-36, 584 N.W.2d 72, in which we affirmed a district court's finding that there was no conversion when the landlord took the tenant's personalty but did not exercise dominion over it in violation of the tenant's rights. We do not believe *Paxton* is persuasive authority here. First, the district court in this case found Dyk exercised dominion and control over the property in defiance of Skaw's rights. Second, *Paxton* was an affirmance of the district court's finding of no conversion and illustrates this Court's limited standard for reviewing findings of fact under N.D.R.Civ.P. 52(a). *See Hust v. N.D. Workers Comp. Bureau*, 1998 ND 20, ¶ 17, 574 N.W.2d 808. The evidence in this case, as in *Paxton*, supports the court's finding.

[¶18] We conclude the district court's finding that Dyk converted Skaw's property is not clearly erroneous.

IV

[¶19] Dyk argues the district court erred in awarding Skaw $17,000 in damages to compensate it for hiring an investigative service to assist in pursuing its claim against Dyk.

7

[¶20] The detriment caused by the wrongful conversion of personal property includes "[a] fair compensation for the time and money properly expended in pursuit of the property." N.D.C.C. § 32-03-23(3). The appropriate standard of review in an appeal challenging a court's award of damages in a bench trial is whether the findings on damages are clearly erroneous. *See Buri v. Ramsey*, 2005 ND 65, ¶ 17, 693 N.W.2d 619.

[¶21] Skaw hired an investigative service to assist in recovering its wrongfully detained property. The purpose of the investigation was to identify the location and the persons who were in possession of more than 150 of Skaw's precast concrete pads, blocks and tanks. The investigator explained:

> My primary goal was to first determine if the pads, blocks and tanks identified as Skaw owned pads, blocks and tanks could be located. If located my secondary goal was to determine how one could reasonably identify a Skaw pad, block or tank from a non Skaw pad, block or tank. If the pads, blocks or tanks could not be located my third and final goal would be to attempt to identify who may have benefited from the disposal and or sale of Skaw asset(s).

Skaw was billed $17,198 for those services.

[¶22] In determining that an award of $17,000 was fair compensation under N.D.C.C. § 32-03-23(3), the district court reasoned:

> The Plaintiff retained Professional Management & Investigations (PMI) to assist Plaintiff in recovering its personal property assets as wrongfully converted by Defendants. The total cost of such services was in the sum of approximately $17,000. The Court determines that the wrongful actions of the Defendants precipitated the Plaintiff's hiring of PMI and the costs accrued by PMI and that such costs would have been significantly reduced had the Defendants allowed Plaintiff to regain possession of Plaintiff's assets.

[¶23] We conclude the district court's award of $17,000 for investigative services is not clearly erroneous.

8

## V

[¶24] It is unnecessary to address other arguments raised because they are either unnecessary to the decision or without merit. The judgment is affirmed.

[¶25] Gerald W. VandeWalle, C.J.
Daniel J. Crothers
Lisa Fair McEvers
Jerod E. Tufte
Jon J. Jensen